# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 21, 2023          Decided August 9, 2024

No. 22-7129

OYOMA ASINOR AND BRYAN DOZIER,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Consolidated with 22-7130

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-02158)
(No. 1:21-cv-02908)

*Michael Perloff* argued the cause for appellants. With him on the briefs were *Kristin L. McGough*, *Scott Michelman*, *Arthur B. Spitzer*, *Tara L. Reinhart*, and *Jeffrey L. Light*.

*Thomas K. Clancy* was on the brief for *amici curiae* Morgan Cloud and Thomas K. Clancy in support of appellants.

2

*Zoé E. Friedland* and *Hanna Perry* were on the brief for *amicus curiae* The Public Defender Service for the District of Columbia in support of appellants.

*Amir H. Ali* was on the brief for *amici curiae* The Roderick and Solange MacArthur Justice Center, et al. in support of appellants.

*Marcella Coburn*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General.

Before: HENDERSON and KATSAS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* KATSAS.

Concurring opinion filed by *Circuit Judge* HENDERSON.

KATSAS, *Circuit Judge*: The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Under settled law, a seizure of personal effects incident to a lawful arrest is reasonable. This case presents the question whether the Fourth Amendment requires that any continued retention of such personal property—even after release of the arrested individuals—must also be reasonable. We hold that it does.

3

I

The appellants in these consolidated appeals allege that the District of Columbia, after arresting and releasing them without charges, for months or years refused to return their personal property seized incident to the arrests.  On review of dismissal orders, we assume that these allegations are true.  *City of Harper Woods Emps.' Ret. Sys. v. Oliver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

In *Cameron v. District of Columbia*, five plaintiffs allege that they were among some 40 individuals arrested in a protest on August 13, 2020.  Upon arresting them, the Metropolitan Police Department seized their personal effects, including their cell phones.  The plaintiffs were quickly released, and the MPD neither pressed charges nor sought warrants to search or continue to possess the phones.  Despite many phone calls and emails to the MPD and the U.S. Attorney's Office, the plaintiffs were unable to get their phones back.

The plaintiffs then invoked D.C. Rule of Criminal Procedure 41(g), which allows a person aggrieved by "the deprivation of property" to "move for the property's return." At first, the plaintiffs filed a Rule 41(g) motion in criminal cases pending in the D.C. Superior Court against other individuals arrested on August 13.  The Deputy Clerk of that court instructed the plaintiffs to refile their motion in a new, standalone case.  After they did so, the District returned the phones of two plaintiffs—285 and 312 days after their arrests.

In November 2021, the five plaintiffs sued the District in federal court.  They alleged claims under the Fourth and Fifth Amendments and common-law conversion, and they sought damages and an injunction ordering the return of their property still held by the MPD.  They also sought to represent classes of

4

August 13 arrestees whose property was not returned within a reasonable amount of time. The District eventually returned the other plaintiffs' phones, more than a year and two months after their arrests.

The district court dismissed the complaint. It reasoned that the plaintiffs had failed to state a Fourth Amendment claim because the initial seizure of their property was reasonable and because any challenge to its continued retention was governed exclusively by the Fifth Amendment. On the Fifth Amendment claim, the court held that Rule 41(g) gave the plaintiffs adequate process to recover their property. And having dismissed the constitutional claims, the court declined to exercise supplemental jurisdiction over the conversion claim and denied the motion for class certification as moot.

In *Asinor v. District of Columbia*, a journalist alleges that he was arrested while photographing an August 31, 2020 protest. When arresting him, the MPD seized his cell phone, camera, and other effects. The journalist was released the same day and informed that he would not face charges. Despite repeated requests, he was unable to retrieve his property for nearly a year. He sued and raised Fourth Amendment, Fifth Amendment, and D.C.-law claims.

The district court dismissed the constitutional claims based on its reasoning in *Cameron*. And it declined to exercise supplemental jurisdiction over the other claims.

The plaintiffs in both cases appealed.

## II

All agree that the MPD's arrest of the plaintiffs was reasonable under the Fourth Amendment. And it is blackletter

5

law that, during an arrest, police may seize personal property held by the arrestee without a warrant. *Riley v. California*, 573 U.S. 373, 384 (2014). So the District's initial seizure of the plaintiffs' effects did not violate the Fourth Amendment.

The question before us is whether the Fourth Amendment has anything to say about the many months in which the MPD allegedly continued to hold the plaintiffs' effects with no legitimate investigatory or protective purpose. The District answers no. It contends that the Fourth Amendment governs the government's taking of possession of an individual's personal property, but not the government's continued possession of the property.

We disagree. When the government seizes property incident to a lawful arrest, the Fourth Amendment requires that any continued possession of the property must be reasonable. We reach this conclusion based on the Fourth Amendment's text and history, as well as modern Supreme Court precedents regarding the constitutionally permissible duration of seizures, whether of property or persons.

A

The Fourth Amendment promises that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. If the right to be "secure" against "unreasonable … seizures" speaks only to the initial moment when the government takes possession of property—that is, the initial moment of seizure—then the District wins. But if this guarantee is instead concerned with the entire duration of the government's possession of the property—that is, the entire period during which the property has been seized—then the plaintiffs win.

6

The bare text of the Fourth Amendment does not answer this question definitively. Founding-era definitions of the word "seizure" are consistent with both readings. The 1773 edition of Johnson's Dictionary defined the word *seizure* to include both "the act of taking forcible possession" and "gripe; possession." 2 S. Johnson, "Seizure," *A Dictionary of the English Language* (1773). In turn, it defined "gripe" as a noun meaning "grasp" or "hold." 1 S. Johnson, "Gripe," *supra.* These definitions suggest that the word "seizure" encompassed both the act of taking possession and continuing possession over time. In other words, when the Fourth Amendment was proposed and ratified, a "seizure" referred to both the act of *taking* possession and the ongoing state of *having taken* possession. But a narrower understanding, limited to the moment of taking possession, was also definitionally possible. In this respect, the meaning of "seizure" was ambiguous in the late eighteenth century, as it is today.

History helps resolve this semantic ambiguity. Because the Fourth Amendment codified a "*pre-existing* right," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), it "must be read in light of" its history, *Chimel v. California*, 395 U.S. 752, 760–61 (1969). And history favors the plaintiffs. As explained below, the Fourth Amendment protects possessory interests against government infringement in the same way that Founding-era common law protected possessory interests against private infringement. And the common law authorized actions for damages and recovery of property that was lawfully taken, but then unlawfully possessed. History thus indicates that the government's continued possession of the plaintiffs' property must be reasonable.

The Fourth Amendment grew out of Antifederalist criticism of the original Constitution. Patrick Henry opposed

7

ratification in part because "any man may be seized, any property may be taken, in the most arbitrary manner, without any evidence or reason." 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 588 (Jonathan Elliott ed., 1891). This criticism was especially salient to the many who considered the Crown's seizures of personal property to be among the grievances justifying the Revolutionary War—with some colonists comparing British officers to "thieves" or lamenting that they would "take and carry away" their property without cause. *See* Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 Yale L. J. 946, 987–94, 991 & n.205 (2016) (cleaned up).

Consistent with this history, Fourth Amendment jurisprudence "reflects [the Amendment's] close connection to property." *United States v. Jones*, 565 U.S. 400, 405 (2012). The standards for identifying Fourth Amendment violations have been "tied to common-law trespass," and the Amendment has been "understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id.* at 405–07.[1] So, to determine whether a particular action violates the Fourth Amendment, we must consider "whether the action was regarded as an unlawful search or seizure under the common law when the Amendment was framed." *Wyoming v. Houghton*, 526 U.S. 295, 299

---

[1] The Court later supplemented this "property-based approach" by holding that the Fourth Amendment also protects a person's "reasonable expectation of privacy." *Jones*, 565 U.S. at 405–06 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). But "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id.* at 409.

8

(1999); *see California v. Hodari D.*, 499 U.S. 621, 626 n.2 (1991). To be sure, not *every* government trespass upon the persons or effects protected by the Fourth Amendment is a "search" or "seizure." *Jones*, 565 U.S. at 408 n.5. A search requires "an attempt to find something or to obtain information," and a seizure requires "some meaningful interference with an individual's possessory interests in … property." *Id.* But when one of these elements exists *and* there is a violation of private property rights, the Fourth Amendment applies. For example, in *Jones*, the government's placement of a GPS tracker on a suspect's car was a Fourth Amendment search because (1) the government attempted to find information, and (2) the act of placing an object on someone else's property would have been a trespass under founding-era common law. *See id.* at 407–08, 408 n.5. By the same logic, there is a Fourth Amendment seizure if the government (1) meaningfully interferes with possessory interests in property in a way that (2) would have been understood to be an actionable property tort at common law.[2]

The plaintiffs' allegations satisfy both prongs of this test. The MPD meaningfully interfered with their possessory interests both by taking possession of their property and by keeping it. The ongoing meaningful interference is self-evident; for as long as the MPD had control of the property, the plaintiffs could not possess it at all. And prolonged, unauthorized possession of a person's property would have

---

[2] *Jones* dealt with a search, not a seizure, and it discussed only the common law of trespass, not other remedies for interference with property like replevin, detinue, and trover. *See generally* Ames, *History of Trover*, 11 Harv. L. Rev. 374 (1897–1898). But *Jones*'s reasoning was not about the specific connection between trespass law and a "search"—it is about the broader relationship between the Fourth Amendment's protections and common-law property rights.

9

been actionable at common law even if the initial taking had been lawful. William Blackstone, "whose works constituted the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), directly addressed this question. He described "the amotion or deprivation of … possession" as an injury to the "rights of personal property in possession" that was "divisible into two branches; the unjust and unlawful *taking* them away; and the unjust *detaining* them, though the original taking might be lawful." 3 W. Blackstone, Commentaries on the Laws of England 145 (1768). He further elaborated that "deprivation of possession may also be by an unjust *detainer* of another's goods, though the original *taking* was lawful"—providing as one example a person who refused to return a borrowed horse. *Id.* at 150–51 (cleaned up). And he then set forth the different remedies available to recover the property and get damages for its wrongful detention, stating that the plaintiff "shall recover damages only for the *detention* and not for the *caption*, because the original taking was lawful." *Id.* at 151–52.

In other words, the common law recognized that property interests are impaired not only at the instant when an owner loses possession, but also for as long as the owner cannot get the property back. And it provided remedies for wrongful interference with possessory rights regardless of whether the interference became wrongful at the moment of the initial seizure or only later. This history indicates that the Fourth Amendment governs the MPD's continued retention, as well as its taking possession, of the plaintiffs' property.

B

Modern caselaw confirms that the Fourth Amendment governs what happens after the government initially seizes

10

property. In *United States v. Jacobsen*, 466 U.S. 109 (1984), the government seized white powder, tested it, and determined that it was cocaine. *Id.* at 111. The Court had no trouble holding that the initial seizure was lawful because it was supported by probable cause. *Id.* at 120–22. But the Court was not finished; it also analyzed whether the field test was reasonable, because "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id.* at 124. The Court further explained that a seizure could become "unreasonable because its length unduly intruded upon constitutionally protected interests." *Id.* at 124 n.25.

These principles govern this case. The MPD's initial seizure of the plaintiffs' effects was lawful because it was incident to their arrests. Such seizures are reasonable to protect the safety of arresting officers and to prevent any destruction of evidence. *See Riley*, 573 U.S. at 381–85. But here, the plaintiffs allege that the government continued to possess their property for many months after it lacked any legitimate interest in protecting officers or investigating possible criminal behavior. And after the government's legitimate interests dissipated, harm to the plaintiffs continued to accrue: It is one thing not to have access to a cell phone while spending a night in jail. It is quite another not to have access to it for the following year. Some plaintiffs allege that they had to replace their phones, a significant financial harm. And some allege that they lost access to important information like passwords, photographs, and contact information for friends and family. So the plaintiffs have alleged that the seizures at issue, though lawful at their inception, later came to unreasonably interfere with their protected possessory interests in their own property.

11

The District contends that *Jacobsen* merely applied *United States v. Place*, 462 U.S. 696 (1983). And it argues that *Place* dealt not with the question whether a seizure lawfully carried out can later become unlawful, but with the question whether probable cause or reasonable suspicion was the necessary standard for justifying a seizure that involved retaining a traveler's suspicious luggage for 90 minutes. *See id.* at 707–10. But regardless of *Place*, *Jacobsen* announced and applied the rule set forth above, in a case presenting no question about when an initial seizure could be justified based only on reasonable suspicion. Moreover, a majority of Justices have reiterated that *Jacobsen* and *Place* set forth a general rule regarding the permissible duration of full-fledged seizures. *See Segura v. United States*, 468 U.S. 796, 812 (1984) (plurality opinion) ("Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons."); *id.* at 823 (Stevens, J., dissenting) ("Even a seizure reasonable at its inception can become unreasonable because of its duration."). The District objects that this statement of law from *Segura* does not bind us because it was not joined by a majority of Justices who concurred in the judgment. *See Marks v. United States*, 430 U.S. 188, 193 (1977). But the fact that six of nine Justices expressed this view certainly suggests that *Jacobsen* is not somehow limited to *Place*'s facts.

The District further seeks to distinguish *Jacobsen* because the field test there, which destroyed a small portion of the seized cocaine, led to a *permanent* deprivation of the relevant property interests, while this case has no comparable intrusion. True enough, the plaintiffs do not allege that the MPD has destroyed or physically damaged their property. But *Jacobsen* cannot fairly be limited to cases involving destruction of property. The Court stated unequivocally that a seizure's

12

"length" and "manner of execution" can make an initially lawful seizure unlawful. *Jacobsen*, 466 U.S. at 124 & n.25. This suggests a concern not only with destruction of property, but with any change in circumstances that makes unreasonable the government's ongoing interference with possessory property interests.

## C

The modern caselaw on the seizure of individuals further confirms our conclusion. When a person is seized, the Fourth Amendment requires reasonableness not only at the moment of arrest, but also for the seizure's entire duration. We see no textual, historical, or other reason to say that the Fourth Amendment protects against the government's prolonged seizure of persons but not its prolonged seizure of effects.

In *Manuel v. City of Joliet*, 580 U.S. 357 (2017), the Supreme Court held that after a person is arrested, the Fourth Amendment requires any pretrial detention to remain reasonable even after the commencement of formal legal process. *Id.* at 359–60. The Court explained that the continued detention of an individual is an ongoing "seizure": Manuel alleged that government officials "detained—which is to say, 'seized'—[him] for 48 days following his arrest. And that detention was 'unreasonable,' the complaint continued, because it was based solely on false evidence, rather than supported by probable cause." *Id.* at 364 (cleaned up). And the Fourth Amendment required continuing reasonableness over time, Manuel argued, even after the start of formal criminal process. *See id.* at 362. The Supreme Court agreed, holding that "Manuel's claim fits the Fourth Amendment, and the Fourth Amendment fits Manuel's claim, as hand in glove." *Id.* at 364.

13

The same logic applies here.  The plaintiffs allege that MPD retained—which is to say, "seized"—their property for over eight months after their arrests.  And they allege that this continued seizure was unreasonable because it served no legitimate investigatory or protective purpose.  By its terms, the Fourth Amendment prohibits unreasonable seizures of "persons, houses, papers, and effects," which suggests that the four listed terms receive analogous protection.  Neither text, grammar, nor history suggest that seizures are ongoing events when directed at "persons" but mere snapshots when directed at "houses, papers, and effects."

Likewise, this Court has held that the Fourth Amendment requires officers to release an arrestee from custody—that is, to end their seizure of a person—if new facts dissipate the probable cause that justified a warrantless arrest.  *Lin v. District of Columbia*, 47 F.4th 828, 841 (D.C. Cir. 2022).  This principle also covers the claims here.  If the rationales that justified the initial retention of the plaintiffs' effects dissipated, and if no new justification for retaining the effects arose, then the Fourth Amendment obliged the MPD to return the plaintiffs' effects.

The District counters that *Torres v. Madrid*, 592 U.S. 306 (2021), distinguishes seizures of persons and effects.  True enough, *Torres* did hold that a person, but not an effect, is "seized" if shot by a government official.  *Id.* at 309, 322–23.  This distinction was based on the "unremarkable proposition that the nature of a seizure can depend on the nature of the object being seized."  *Id.* at 324.  The proposition mattered because the seizure of a person implicates the common law of arrest, while the seizure of an effect does not.  *Id.* at 312–13.  But while *Torres* thus explained *why* people and effects are different in the specific context of a shooting, the District offers

14

no good reason why people and effects are different with respect to ongoing seizures in general. Moreover, even *Torres*'s limited and "unremarkable" conclusion was a contested departure from the ordinary presumption that "courts cannot give a single word different meanings depending on the happenstance of which object it is modifying." *Id.* at 332 (Gorsuch, J., dissenting) (cleaned up). So, *Torres* does not justify a categorical break between Fourth Amendment law governing persons and its law governing effects.

More narrowly, the District argues that governments must apply continuing force to seized persons, who would often wish to flee, which is why *Manuel* recognized the need for ongoing reasonableness of the detention. In contrast, the District argues, there is no continuing application of force against an inanimate object, and thus no need for its prolonged retention to be reasonable. This argument misses the point. Of course, the government does not use force against a cell phone, just as it does not infringe upon the property interests of a cell phone. But it infringes upon a *person*'s possessory property interests *in* a cell phone. And whether the government infringes upon a liberty or property interest, it hopes to avoid using force, but will do so if necessary. An arrested individual will be subjected to force if he tries to walk out of his jail cell. But so too will a cell phone owner who tries to walk into police headquarters to remove the phone from an evidence locker. In both instances, the government is prepared to use force to prolong an ongoing deprivation of liberty or property. If the Fourth Amendment addresses the former, we see no reason why it does not also address the latter.

15

III

The District makes several counterarguments based on caselaw, the Fifth Amendment, and assertedly dire consequences.  We find none of them convincing.

A

The District contends that *Hodari D.* and *Torres* resolve any semantic ambiguity in the word "seizure."  According to the District, those cases establish that "seizure" means "taking possession" and refers to a "single act" rather than a "continuous fact."  *Torres*, 592 U.S. at 312, 323; *Hodari D.*, 499 U.S. at 624, 625.  The District argues that these statements show that its "seizure" occurred only when the MPD took the plaintiffs' property into its possession—and that only that single act must be reasonable.

We disagree.  Viewed in isolation, these snippets sound good for the District.  But *Hodari D.* and *Torres* both address what must happen for the government to effect a seizure in the first place; neither case presents the question whether a seizure must remain reasonable over time.  Read in context, the highlighted statements do not support the District's position, which is inconsistent with many other cases.

In *Hodari D.*, the Supreme Court rejected an argument that a suspect had been "seized" when he saw a police officer running toward him; instead, the seizure occurred only when the officer tackled him.  499 U.S. at 622–23, 629.  The Court reasoned that, at common law, a "seizure" required "taking possession."  *Id.* at 624.  But although the suspect was not seized *until* the police took possession of him, that does not make prolonged detention *after* the initial arrest any less of a seizure.  Then—with a *cf.* citation to a 19th century case about

16

the seizure of a ship—the Court said that a "seizure is a single act, and not a continuous fact" to bolster its point that, had the suspect escaped custody, there would have been no "*continuing* arrest during the period of fugitivity." *Id.* at 625 (quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471 (1874)). But that does not mean there is no continuing seizure when the police continue to hold a person or property in custody.

*Torres* is similar. As discussed above, it held that the police had "seized" a fleeing suspect when they shot but failed to detain her. The Court acknowledged *Hodari D.*'s statement that "from the time of the founding to the present, the word 'seizure' has meant a 'taking possession'" immediately before explaining that "seizure" can also have a broader meaning that encompasses the common law of arrest. *See* 592 U.S. at 312–13 (cleaned up). And it reasoned—echoing the second portion of *Hodari D.* just discussed—that "a seizure is a single act, and not a continuous fact" to explain the line-drawing issues that would arise if shooting a suspect did not constitute a seizure. *See id.* at 323 (cleaned up). At no point did the Court suggest that the suspect *stopped* being seized after she was shot—only that she *had been* seized once shot. Like *Hodari D.*, *Torres* simply does not address the question whether the prohibition on "unreasonable seizures" applies only for a single moment or for the duration of the government's possession.

Other cases, however, do address this question. Blackletter Fourth Amendment law—including the caselaw that we have already discussed—establishes that a "seizure" has a duration. *Jacobsen* said that a lawful seizure may become "unreasonable because [of] its length." 466 U.S. at 124 n.25. And *Manuel* described a prisoner as having been "detained—which is to say, 'seized' … for 48 days." 580 U.S. at 364. Still other cases likewise have described "seizures" as reflecting an

17

ongoing state.  *See*, *e.g.*, *Rodriguez v. United States*, 575 U.S.
348, 354 (2015) (noting that the "tolerable duration" of a traffic
stop depends on the "seizure's mission" (cleaned up)); *Illinois
v. Caballes*, 543 U.S. 405, 407 (2005) (citing *Jacobsen* for the
proposition that the "initial seizure" of a traffic stop that was
"concededly lawful" could "become unlawful" if it were
"prolonged beyond the time reasonably required"); *Gerstein v.
Pugh*, 420 U.S. 103, 114 (1975) (holding that, even though
warrantless arrests do not always run afoul of the Fourth
Amendment, "the Fourth Amendment requires a judicial
determination of probable cause as a prerequisite to extended
restraint of liberty following arrest").

The two lines of cases can be reconciled.  *Hodari D.* and
*Torres* show that the government "takes possession" of a
person or object at a single moment in time.  The other cases
show that, once the government has taken possession of a
person or object, its conduct must remain reasonable over time.
At both the moment of seizure and throughout its duration, the
government's conduct must be reasonable—consistent with
both founding-era meanings of the word "seizure."

B

The District acknowledges a constitutional obligation to
return the plaintiffs' property, but it locates the duty in the Fifth
Amendment's guarantee that no person shall be "deprived of
… property, without due process of law."  U.S. Const. Amend
V.  In other words, because the Fifth Amendment protects the
plaintiffs' ongoing possessory interests, the Fourth
Amendment does not.

But constitutional provisions do not preempt one another
like that.  Indeed, the Supreme Court has already rejected the
argument that the Fourth Amendment does not apply to

18

interferences with property rights just because the Fifth Amendment does. *Soldal v. Cook County*, 506 U.S. 56, 70–71 (1992). The Court reasoned that "[c]ertain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands." *Id.* at 70. And if "multiple violations are alleged," we must "examine each constitutional provision in turn." *Id.* So, the question whether this case implicates procedural due process, substantive due process, or the Takings Clause is irrelevant to the question whether it also implicates the Fourth Amendment.

Even if we had to pick between constitutional provisions, we do not share the District's confidence that the Fifth Amendment fits the plaintiffs' claims better than the Fourth. The District argues that a hearing under D.C. Criminal Rule 41(g)—which allows a "person aggrieved" by a property deprivation to "move for the property's return"—affords constitutionally sufficient process for the adjudication of the plaintiffs' claims. But even if a hearing under Rule 41(g) provides adequate process, the question remains what substantive law would require the District to return property held without justification. We are reluctant to reduce this entirely to a question of D.C. law, which would eliminate substantive constitutional protection for the property rights at issue. As for other portions of the Fifth Amendment, it is unclear whether the government's continued retention of lawfully seized property would constitute an unconstitutional taking. *See Bennis v. Michigan*, 516 U.S. 442, 452 (1996). And we prefer guideposts from "an explicit textual source of constitutional protection against a particular sort of government behavior" to the more amorphous standards of "substantive due process." *Abdelfattah v. DHS*, 787 F.3d 524, 541 (D.C. Cir. 2015) (cleaned up). Here, the Fourth Amendment is just such a textual source; it "was tailored

19

explicitly for the criminal justice system" and strikes a "balance between individual and public interests" that has always "been thought to define the 'process that is due' for seizures of persons or property in criminal cases." *Gerstein*, 420 U.S. at 125 n.27. An argument that we need not consider the Fourth Amendment because of substantive due process thus gets things backward; instead, we need not consider substantive due process because of the Fourth Amendment.

C

The District points to two decisions that it says reject Fourth Amendment claims in analogous contexts: *Tate v. District of Columbia*, 627 F.3d 904 (D.C. Cir. 2010), and *City of West Covina v. Perkins*, 525 U.S. 234 (1999). We find both cases distinguishable.

In *Tate*, we considered a Fourth Amendment challenge to the sale of an impounded vehicle to pay two outstanding parking tickets. 627 F.3d at 906–07. Christina Tate argued that the sale was a disproportionate response to her tickets. *Id.* at 912. We rejected her Fourth Amendment claim, because the "sale itself was not a 'seizure' of Tate's vehicle which was already in the District's lawful possession and control." *Id.* We held that the sale was "properly subject to constitutional challenge, if at all, under the Fifth Amendment as an unlawful taking or a violation of due process." *Id.* But in that case, the District had assumed title to the vehicle under a "forfeiture regime" governing abandoned property. *Id.* at 907–09, 912. And once title was transferred, Tate lacked any ongoing property interest. So, at that point, the District's conduct stopped being a "seizure" and became a permanent claim of title. We held that a constitutional challenge to that claim fell under the Fifth Amendment, not the Fourth. *Id.* at 908–09,

20

911–12.  But here, the District never claimed title to the disputed property, so *Tate* sheds little light on this case.

*City of West Covina* is even farther afield.  There, the Court held that procedural due process does not require the government "to give detailed and specific instructions or advice to owners who seek return of property lawfully seized but no longer needed for police investigation or criminal prosecution."  525 U.S. at 236.  No Fourth Amendment claim was raised or considered.  And because nobody "contest[ed] the right of the State to have seized the property in the first instance or its ultimate obligation to return it," the Court set aside any question about what rules may restrict "the substantive power of the State to take property."  *Id.* at 240.  This framing of the question, assuming a protected property interest and addressing what procedural protections must attach, simply does not address whether the Fourth Amendment requires the government's ongoing possession of seized property to be substantively reasonable.[3]

### D

Finally, the District warns of the consequences of holding that the Fourth Amendment requires ongoing retention of seized property to be reasonable.  The District frets that such a ruling would constitutionalize pedestrian, state-law rules about

---

[3]  The District also notes that some of our sister Circuits have held that the Fourth Amendment does not address the reasonableness of the government's continuing retention of lawfully seized effects.  *See*, *e.g.*, *Lee v. City of Chicago*, 330 F.3d 456, 460–66 (7th Cir. 2003); *Fox v. Van Oosterum*, 176 F.3d 342, 349–52 (6th Cir. 1999).  But the Ninth Circuit has adopted our approach.  *See Brewster v. Beck*, 859 F.3d 1194, 1196–98 (9th Cir. 2017).  And for reasons explained above, we find its conclusion more persuasive.

21

how to return arrestees' property.  In *Soldal*, the government likewise objected that applying the Fourth Amendment would involve "federalizing areas of law traditionally the concern of the States."  506 U.S. at 71.  But like the Court in *Soldal*, we "think the risk is exaggerated."  *Id.*

The Fourth Amendment prohibits only unreasonable seizures—which only modestly restricts the government's ability to continue retaining lawfully seized property.  Of course, it can reasonably retain contraband or evidence in an ongoing criminal investigation or trial.  *See United States v. Farrell*, 606 F.2d 1341, 1347 (D.C. Cir. 1979).  It can also seek warrants to search seized cell phones or other personal property.  *See Riley*, 573 U.S. at 401.  Nothing in our holding limits the government's ability to use seized effects for legitimate law-enforcement purposes.

Moreover, even when there the government no longer has a valid reason to retain lawfully seized property, we do not suggest that it must always return the property instantaneously. Matching a person with his effects can be difficult, as can the logistics of storage and inventory.  And the retention of personal property is, of course, less burdensome than being held in custody.  In other words, returning seized effects will often be more difficult for the government and less important to the affected individuals than releasing seized persons— which means that some delays that would be unreasonable as to persons may be reasonable as to effects.

At the same time, the Fourth Amendment does require continuing retention of seized property to be reasonable.  And the plaintiffs' allegations raise serious questions about the reasonableness of the MPD's handling of their property for months or years after their release from custody without

22

charges.   The district court erred in concluding that these allegations do not implicate the Fourth Amendment.[4]

IV

Having resolved the Fourth Amendment claims, we turn to the other issues in this appeal.   The plaintiffs do not challenge the dismissal of their Fifth Amendment claims.   But both sets of plaintiffs argue that the district court should reconsider its decision not to exercise supplemental jurisdiction over their D.C.-law claims, and the *Cameron* plaintiffs also argue that the district court should reevaluate its denial of class certification in their case.

We agree.   The sole rationale that the district court offered for declining to exercise supplemental jurisdiction was that there were no federal claims left in the cases.   And the sole rationale for denying class certification in *Cameron* was that the merits dismissals had mooted the certification issue. Because our decision has overtaken both rationales, the district court should reconsider whether supplemental jurisdiction and class certification are appropriate.

---

[4]  The parties appear to agree, as do we, that the district court misread the complaints as alleging an alternative theory that the MPD unreasonably delayed a search of the plaintiffs' property.   The Fourth Amendment claims here rest only on the MPD's prolonged retention of the property itself.   Because the district court held that the complaints stated no Fourth Amendment violation, it did not reach the question whether the complaints adequately alleged a municipal custom or policy under *Monell v. Department of Social Services*, 436 U.S. 658 (1977).   We decline to address that question in the first instance.

23

V

For these reasons, we reverse the dismissal of the Fourth
Amendment claims; vacate the dismissal of the D.C.-law
claims and the denial of class certification in *Cameron*; and
remand both cases for further proceedings consistent with this
opinion.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring: I join the majority opinion in full. The Fourth Amendment's protections do not cease once the government takes possession of an individual's property. I write separately to explain why I believe we correctly part ways with many of our sister circuits.

Five circuits — the First, Second, Sixth, Seventh and Eleventh — have held in precedential opinions that the Fourth Amendment does not support a claim for the government's retention of legally seized property. *Denault v. Ahern*, 857 F.3d 76, 84 (1st Cir. 2017); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004); *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999); *Lee v. City of Chicago*, 330 F.3d 456, 466 (7th Cir. 2003); *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009). Only the Ninth Circuit disagrees. *Brewster v. Beck*, 859 F.3d 1194, 1197 (9th Cir. 2017).[1] Granted, we should hesitate before rejecting a robust consensus from our sister circuits but here, I believe, their reasoning lacks the power to persuade because they fail to discuss the key Supreme Court precedent, *United States v. Jacobsen*, 466 U.S. 109 (1984).

To begin with, most of the contrary opinions have considered the issue only in passing. In *Denault*, the plaintiffs halfheartedly raised a continuing seizure claim but made "no effort" to "explain why the alleged violation of their constitutional rights sound[ed] in the Fourth Amendment." 857 F.3d at 83. The First Circuit rejected the theory without independent analysis because plaintiffs had "offered no reason to disagree" with the circuits that had already rejected such a theory. *Id.* at 84. The Second Circuit simply reasoned that "a seizure claim based on the unlawful retention [of property] was too 'novel' a theory to warrant Fourth Amendment protection." *Shaul*, 363 F.3d at 187 (quoting *United States v. Jakobetz*, 955

---

[1] The Fourth Circuit may also agree with us. *See Mom's Inc. v. Willman*, 109 F. App'x 629, 637 (4th Cir. 2004) (unpublished).

2

F.2d 786, 802 (2d Cir.1992)); *see also Denault*, 857 F.3d at 83 (noting that "the Second Circuit rejected the seizure-includes-retention theory out of hand"). The Eleventh Circuit gave the issue almost equally short shrift. *See Casey*, 555 F.3d at 1330–31. None of these opinions discussed relevant Supreme Court precedent or competing definitions of "seizure."

The Sixth Circuit's opinion in *Fox* and the Seventh Circuit's opinion in *Lee* are exceptions. *Fox* reasoned that the Supreme Court had found a seizure of property only in "cases where there is no debate that the challenged act is one of taking property away from an individual and the issue is whether that act of taking property away constitutes a meaningful interference with possessory interests." 176 F.3d at 351. Because it concentrated on the moment of taking, the *Fox* court concluded that "the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property." *Id. Lee* reached its conclusion differently. It relied on what it considered the "temporally limited" definition of "seizure" at the Founding, on in-circuit precedent rejecting the idea of continuing seizures in the context of persons and the "practical concerns" it foresaw in extending the Fourth Amendment. *See Lee*, 330 F.3d at 462–65.

But *Fox* and *Lee*, thorough as they are in many respects, focused on the wrong Supreme Court precedent. Both discussed *United States v. Place*, 462 U.S. 696 (1983), without recognizing that the Court's later *Jacobsen* decision extended *Place*. *See Lee*, 330 F.3d at 464; *Fox*, 176 F.3d at 351 n.6. In *Place*, law enforcement took a suspicious traveler's luggage and held it for ninety minutes before securing a narcotics dog to conduct a "sniff test" for drugs. *Id.* at 699. The Court held that law enforcement may, as a general matter, detain property "on the basis of less than probable cause, for the purpose of

3

pursuing a limited course of investigation," *id.* at 702, "provided that the investigative detention is properly limited in scope," *id.* at 706. But the Court went on to hold that the seizure at issue was unreasonable because of "[t]he length of the detention of respondent's luggage." *Id.* at 709. As *Fox* and *Lee* recognized, the reason that the length of the detention was crucial in *Place* was the fact that law enforcement lacked probable cause. *See Lee*, 330 F.3d at 464; *Fox*, 176 F.3d at 351 n.6. Although "some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests" that they can be justified on less than probable cause, *Place*, 462 U.S. at 706, the Court emphasized that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion," *id.* at 709.

Standing alone, *Place* offers little rationale for finding that the Fourth Amendment applies to the government's retention of lawfully seized property. The fact that investigatory detentions made without probable cause must be of a reasonable duration does not dictate that the Fourth Amendment requires the same for all property seizures. But the Court added to *Place* in *Jacobsen*, which connection neither *Fox* nor *Lee* discussed.[2] There, the government seized white powder from a package and tested it to determine that it was cocaine. *Jacobsen*, 466 U.S. at 111. The Court held the powder's initial seizure was supported by probable cause. *Id.* at 120–22. But, critically for our purpose, the Court then turned to the reasonability of the government's actions *after* the initial lawful seizure: "whether the additional intrusion occasioned by the field test . . . was an unlawful 'search' or 'seizure' within

---

[2] *Jacobsen* is scarcely cited across the two opinions and never for the portion of it pertinent here.

4

the meaning of the Fourth Amendment." *Id.* at 122. The Court explained that, under *Place*, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *Id.* at 124. In a footnote, the Court described *Place* as holding that "while the initial seizure of luggage for the purpose of subjecting it to a 'dog sniff' test was reasonable, the seizure became unreasonable because its length unduly intruded upon constitutionally protected interests." *Id.* at 124 n.25. The Court ultimately found that the field test, which destroyed "a trace amount" of the powder, was reasonable. *Id.* at 125.

I respectfully submit that our two sister circuits have failed to recognize that *Jacobsen* broadened *Place*.[3] *Jacobsen* applied *Place* in a new context, extending it from its investigatory detention origin to circumstances in which a full and lawful "initial seizure" had already occurred. *See id.* at 124 (internal quotation marks removed). Thus, when *Jacobsen* refers to "seizure[s] lawful at [their] inception," *id.*, it refers not just to the narrow class of seizures at issue in *Place* but to all lawful seizures of property. Those seizures "can nevertheless violate the Fourth Amendment" if their "manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment[]." *Id.*

Nor, in my view, can a seizure's "manner of execution" be read as somehow distinct from its duration. True, the only time *Jacobsen* refers to the "length" of a seizure is in the footnote describing *Place*'s holding. *See id.* at 124 n.25. But that footnote immediately follows the "manner of execution"

---

[3]    It is no coincidence that the only circuit to reach our conclusion cited *Jacobsen* in support. *See Beck*, 859 F.3d at 1196, 1197.

5

sentence; in context, then, the Court suggested that an
unreasonable length is one way the execution of an initially
lawful seizure can violate the Fourth Amendment. Indeed, in
one sense, the respondent's challenge to the field test was a
challenge to the duration of the seizure: the test "destroy[ed] a
quantity of the powder" and therefore "converted what had
been only a temporary deprivation of possessory interests into
a permanent one." *Id.* at 124–25. When the government
destroys property, the length of the seizure is necessarily
"permanent." However one characterizes the field test
challenge, the bottom line is that the Supreme Court
unequivocally held that what the government does with seized
property can sometimes violate the Fourth Amendment even
though "the property ha[s] already been lawfully detained." *Id.*
at 125. I believe the Fourth Amendment's continued
applicability after the initial seizure cannot be squared with the
notion that "[o]nce th[e] act of taking the property is complete,
the seizure has ended and the Fourth Amendment no longer
applies." *Fox*, 176 F.3d at 351; *see also Lee*, 330 F.3d at 466
("Once an individual has been meaningfully dispossessed, the
seizure of the property is complete, and once justified by
probable cause, that seizure is reasonable. The amendment then
cannot be invoked by the dispossessed owner to regain his
property.").[4]

---

[4]    As my colleagues note, *see* Maj. Op. 12–13, the Supreme
Court's more recent decision in *Manuel v. City of Joliet*, 580 U.S.
357 (2017), lends further support to our conclusion. There, the Court
held that the Fourth Amendment applies throughout the duration of
a person's pretrial detention. *See id.* at 366 ("[T]hose objecting to a
pretrial deprivation of liberty may invoke the Fourth Amendment
when (as here) that deprivation occurs after legal process
commences."). Under the most natural reading of the Fourth
Amendment, we should give analogous protection against the seizure
of "persons" and "effects," at least absent a well-defined historical

6

In sum, I agree with my colleagues that *Jacobsen* "govern[s] this case." Maj. Op. at 10. And, for the reasons I have given, I am untroubled that our holding puts us on the minority side of a circuit split.

---

tradition to the contrary. *See Torres v. Madrid*, 592 U.S. 306, 324 (2021). To me, *Manuel* suggests as a corollary that Fourth Amendment protections for property endure over time, too.