NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

Nos. 22-7129, 22-7130

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

OYOMA ASINOR, *et al.*,

APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,

APPELLEES.

———————————

ALEXANDER CAMERON, *et al.*,

APPELLANTS,

v.

DISTRICT OF COLUMBIA,

APPELLEE.

———————————

CONSOLIDATED APPEALS FROM JUDGMENTS OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

MARCELLA COBURN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5693
marcella.coburn@dc.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A. *Parties and amici*.—Except for the following, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellants.  Amici supporting appellants are Morgan Cloud, Thomas K. Clancy, The Roderick and Solange MacArthur Justice Center, Cato Institute, Institute for Justice, and the Public Defender Service for the District of Columbia.

B. *Rulings under review*.—References to the rulings at issue appear in the Brief for Appellants.

C. *Related cases*.—These consolidated cases have not previously been before this Court or any other court and counsel is unaware of any related cases currently pending in this Court or the district court.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES ..............................................................1

STATEMENT OF THE CASE ...............................................................2

    1.    Statutes, Regulations, and Policies Governing the Recording, Handling, and Disposition of Property by the Metropolitan Police Department ..................................................................2

    2.    Factual Background...........................................................5

    3.    Procedural History............................................................7

STANDARD OF REVIEW ...................................................................11

SUMMARY OF ARGUMENT ...............................................................11

ARGUMENT .....................................................................................15

    I.    As The Overwhelming Majority Of Circuit Courts That Have Addressed This Issue Agree, The Government's Failure To Return Lawfully Seized Property Does Not Violate The Fourth Amendment .......................................................................15

        A.    A "seizure" is a temporally limited act that, in these cases, ended before the failure to return property ...............................16

        B.    The Due Process Clause governs the retention of lawfully seized property .........................................................20

        C.    The Supreme Court and this Court's precedents are consistent with the rule in the vast majority of circuits............24

            1.    *Place*, *Jacobsen*, and *Segura* do not support plaintiffs' broad rule ......................................24

            2.    The cases challenging a delayed search warrant do not support plaintiffs' rule ...............................28

            3.    Cases about seizures of persons are not applicable here ...................................................................32

D.     The few court of appeals opinions to the contrary are not persuasive ..................................................................38

II.     Even Assuming The Fourth Amendment Applies To A Failure To Return Lawfully Seized Property, Dismissal Is Proper Because Plaintiffs Failed To Adequately Allege Municipal Liability ........................................................................40

A.     The Court can reach this question...........................................41

B.     The standard for municipal liability is high.............................42

C.     Plaintiffs' allegations inadequately allege a custom of retention of lawfully seized personal property without any legitimate law enforcement purpose .........................................44

III.     The District Court Properly Declined To Exercise Supplemental Jurisdiction ........................................................................50

CONCLUSION ........................................................................50

# TABLE OF AUTHORITIES*

*Cases*

*Baker v. District of Columbia*,
   326 F.3d 1302 (D.C. Cir. 2003) ......................................................... 43

*Banneker Ventures, LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015) ......................................................... 11

*Barnett v. MacArthur*,
   956 F.3d 1291 (11th Cir. 2020) ......................................................... 38

*Bd. of Cnty. Comm'rs v. Brown*,
   520 U.S. 397 (1997) ......................................................... 45

*Bell v. City of Chicago*,
   835 F.3d 736 (7th Cir. 2016) ......................................................... 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................... 46

*Blue v. District of Columbia*,
   811 F.3d 14 (D.C. Cir. 2015) ......................................................... 40, 41, 42

*Brewster v. Beck*,
   859 F.3d 1194 (9th Cir. 2017) ......................................................... 20, 38, 39

*Brower v. County of Inyo*,
   489 U.S. 593 (1989) ......................................................... 48

*California v. Hodari D.*,
   499 U.S. 621 (1991) ......................................................... 16, 17, 18

*Caniglia v. Strom*,
   141 S. Ct. 1596 (2021) ......................................................... 31

---

*        Authorities upon which we chiefly rely are marked with asterisks.

*Carter v. District of Columbia*,
  795 F.2d 116 (D.C. Cir. 1986)........................................................... 49

*Case v. Eslinger*,
  555 F.3d 1317 (11th Cir. 2009) ................................................. 19, 23

*\*City of St. Louis v. Praprotnik*,
  485 U.S. 112 (1988)................................................................... 14, 43

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821) ........................................................ 24

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
  975 F.2d 871 (D.C. Cir. 1992)......................................................... 25

*Conyers v. City of Chicago*,
  10 F.4th 704 (7th Cir. 2021) ........................................................... 19

*County of Riverside v. McLaughlin*,
  500 U.S. 44 (1991)......................................................................... 49

*Denault v. Ahern*,
  857 F.3d 76 (1st Cir. 2017)....................................................... 19, 23

*English v. District of Columbia*,
  717 F.3d 968 (D.C. Cir. 2013)..................................................... 11, 50

*\*Fox v. Van Oosterum*,
  176 F.3d 342 (6th Cir. 1999) ............................................... 19, 22, 23

*Gilmore v. City of Minneapolis*,
  837 F.3d 827 (8th Cir. 2016) ..................................................... 20, 23

*Hammond v. Lancaster City Bureau of Police*,
  No. 17-cv-1885, 2021 WL 5987734 (E.D. Pa. Dec. 16, 2021) ........................ 20

*Hudson v. Palmer*,
  468 U.S. 517 (1984)....................................................................... 34

*\*Hurd v. District of Columbia*,
  997 F.3d 332 (D.C. Cir. 2021)............................................... 42, 43, 48

*Illinois v. Caballes*,
   543 U.S. 405 (2005) ........................................................... 36

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ........................................................... 37

*Lavan v. City of Los Angeles*,
   693 F.3d 1022 (9th Cir. 2012) ............................................ 39

*\*Lee v. City of Chicago*,
   330 F.3d 456 (7th Cir. 2003) ........................................ 18, 19, 23, 25

*Lin v. District of Columbia*,
   47 F.4th 828 (D.C. Cir. 2022) ............................................ 37

*Lombardo v. City of St. Louis*,
   141 S. Ct. 2239 (2021) ....................................................... 37

*Manuel v. City of Joliet*,
   580 U.S. 357 (2017) ...................................................... 35, 36, 37

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ........................................................... 10

*Mitan v. U.S. Postal Inspection Serv.*,
   656 F. App'x 610 (3d Cir. 2016) ........................................ 20

*Mom's Inc. v. Willman*,
   109 F. App'x 629 (4th Cir. 2004) .................................. 20, 39, 40

*Monell v. Dep't of Soc. Servs.*,
   346 U.S. 658 (1978) ........................................................... 42

*Nelson v. Streeter*,
   16 F.3d 145 (7th Cir. 1994) ............................................... 40

*Parker v. District of Columbia*,
   850 F.2d 708 (D.C. Cir. 1988) ....................................... 14, 46

*Plamp v. Mitchell Sch. Dist.*,
   565 F.3d 450 (8th Cir. 2009) ............................................. 44

*Reliford v. Craig*,
No. 2:16-cv-482, 2017 WL 6372634 (S.D. Tex. Nov. 22, 2017)...................... 20

*Rodriguez v. United States*,
575 U.S. 348 (2015)................................................................... 35, 36

*Segura v. United States*,
468 U.S. 796 (1984)................................................................ 27, 28, 31

*Shaul v. Cherry Valley Springfield Cent. Sch. Dist.*,
363 F.3d 177 (2d Cir. 2004) ...................................................... 19, 23

*Smith v. Travelpiece*,
31 F.4th 878 (4th Cir. 2022) ............................................................ 40

*Snider v. Lincoln Cnty. Bd. of Cnty. Comm'rs*,
313 F. App'x 85 (10th Cir. 2008) .............................................. 20, 23

*Soldal v. Cook County*,
506 U.S. 56 (1992)............................................................. 17, 22, 32

*Tate v. District of Columbia*,
627 F.3d 907 (D.C. Cir. 2010)........................................ 11, 17, 35, 36

*Thompson v. Whitman*,
85 U.S. (18 Wall.) 457 (1874) ........................................................ 17

*Torres v. Madrid*,
141 S. Ct. 989 (2021)...................... 11, 15, 16, 17, 21, 33, 34, 35, 37

*Triplett v. District of Columbia*,
108 F.3d 1450 (D.C. Cir. 1997)....................................................... 43

*United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015)........................................................ 41

*United States v. Burgard*,
675 F.3d 1029 (7th Cir. 2012) ........................................................ 30

*United States v. Christie*,
717 F.3d 1156 (10th Cir. 2013) ............................................. 28, 29, 31

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ................................................................ 15, 26

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ................................................................ 20, 45

*United States v. Laist*,
    702 F.3d 608 (11th Cir. 2012) ............................................... 30

*United States v. Miller*,
    799 F.3d 1097 (D.C. Cir. 2015) ............................................ 15

*United States v. Place*,
    462 U.S. 696 (1983) ............................................................... 25

*United States v. Pratt*,
    915 F.3d 266 (4th Cir. 2019) ................................................. 30

*United States v. Smith*,
    967 F.3d 198 (2d Cir. 2020) ................................................ 31, 49

*United States v. Sokolow*,
    490 U.S. 1 (1989) .................................................................. 29

*United States v. Wilson*,
    540 F.2d 1100 (D.C. Cir. 1976) ............................................ 21

*Warren v. District of Columbia*,
    353 F.3d 36 (D.C. Cir. 2004) ................................................ 47

*Weeks v. United States*,
    232 U.S. 383 (1914) ............................................................... 18

*Wyoming v. Houghton*,
    526 U.S. 295 (1999) ............................................................... 34

## Constitutional Provisions

U.S. Const. amend. IV ................................. 8-13, 15-21, 26, 28-40, 48-49

U.S. Const. amend. V ...................................... 8, 10, 12, 16, 20-23, 37

*Statutes and Regulations*

D.C. Code § 5-119.01 ..................................................................... 2

D.C. Code § 5-119.02 ................................................................... 23

D.C. Code § 5-119.06 ..................................................................... 2

D.C. Code § 5-119.09 ..................................................................... 2

D.C. Code § 5-119.10 ..................................................................... 2

D.C. Code § 5-1104 ...................................................................... 47

42 U.S.C. § 1983 ............................................................................ 7

6A DCMR § 804 ............................................................................. 2

6A DCMR § 807 ............................................................................. 3

6A DCMR § 2103 ......................................................................... 47

Super. Ct. Crim. R. 41 ............................................................4, 5, 10, 22, 23

Fed. R. Crim. P. 41 ...................................................................4

*Other*

Kaveh Wendell, *Police Can Use a Legal Gray Area to Rob Anyone of Their Belongings*, The Atlantic (Aug. 15, 2016), https://tinyurl.com/3vxpt5vb .........45

Metro. Police Dep't, *Annual Report 2020*, https://tinyurl.com/2s3rt2ch ...............47

## GLOSSARY

AUSA                Assistant United States Attorney

MPD                 District of Columbia Metropolitan Police Department

RD                  Record Document (ECF document number)

USAO                United States Attorney's Office for the District of Columbia

## STATEMENT OF THE ISSUES

The District of Columbia Metropolitan Police Department ("MPD") lawfully seized cell phones and other personal property from plaintiffs upon their arrest and detention.  Plaintiffs sued the District, alleging that it retained their property for longer than reasonably necessary for any legitimate purpose.  The district court rejected plaintiffs' challenges to the adequacy of the procedures afforded them under District law to reclaim their property.  On appeal, plaintiffs do not dispute the adequacy of those procedures but instead challenge the court's rejection of their separate claim that the unduly long retention of their property violated the Fourth Amendment.  The issues presented are:

1.  Does the Fourth Amendment's prohibition against unreasonable seizures apply to the government's failure to return lawfully seized property in addition to the Fifth Amendment's requirement that the District provide adequate process to ensure the property's rightful return?

2.  Even assuming plaintiffs can state a claim under the Fourth Amendment for return of their lawfully seized property, have they adequately alleged that the District has a widespread, pervasive custom of retaining lawfully seized personal property longer than reasonably necessary for any legitimate law enforcement purpose, where most examples stem from one high-arrest event with murky details, and where plaintiffs have not adequately alleged that any custom is intentional?

## STATEMENT OF THE CASE

1.    **Statutes, Regulations, and Policies Governing the Recording, Handling, and Disposition of Property by the Metropolitan Police Department.**

MPD officers lawfully recover many different types of property under a variety of circumstances.  District law classifies and prescribes special procedures for handling and disposing of each type of property.  *See, e.g.*, D.C. Code § 5-119.10 (found or abandoned property); *id.* § 5-119.09(b) (property of a deceased person); *id.* § 5-119.09(c) ("property belonging to any person who has been adjudged of unsound mind"); *id.* § 5-119.06(d) ("property alleged to be feloniously obtained or to be the proceeds of a crime"); 6A DCMR § 804.3 (property "to be used as evidence in court").  To carry out these procedures, Congress created the Office of the Property Clerk for MPD and charged the Property Clerk with disposing of property according to law.  D.C. Code § 5-119.01; *see also* 6A DCMR § 804.

MPD, in turn, has issued comprehensive policies and procedures for the recording, handling, and disposition of various types of property, including cell phones seized incident to arrests.  General Order 601.1 addresses property belonging to arrestees ("prisoner's property"), found and abandoned property, property set out for eviction, estates of deceased persons, property of the alleged mentally ill, evidence, suspected proceeds of crime, property held for civil forfeiture, and impounded vehicles, among other categories.  JA 71.  MPD's policies require that every item be given its own paper trail, called a PD Form 81, to describe the item,

identify the owner of the item, and record its chain of custody. JA 119. And Special Order 15-08 provides specific procedures for the recovery of cell phones. JA 110.

When a person is arrested, MPD confiscates and processes the property the person has with them, including their cell phone. JA 86-87, 111-12. If MPD recovers a cell phone from an arrestee and there is no reason to believe the phone is stolen or has any evidentiary value, it is treated as "prisoner's property" and is recorded and stored accordingly. JA 111-12. If MPD recovers a cell phone from an arrestee charged with a felony, a theft-related offense, or if there is reason to believe the device does have evidentiary value, it is categorized as evidence and stored in a designated location. JA 112. MPD detectives are required to ensure that any search warrant application is presented as soon as possible, but no later than 48 hours after the phone is recovered. JA 113.

Because the U.S. Attorney's Office for the District of Columbia ("USAO") serves as a local prosecutor in the District, MPD works with the USAO on certain arrests and prosecutions, including the no-papered arrests[1] in these cases. *See* JA 19, 53. District regulations and MPD policy require the USAO to sign off on the release of property when a case is no papered to confirm that the property is not needed as evidence. *See* 6A DCMR § 807.3 ("Before returning [property not subject

---

[1]    If an arrest is "no papered," it means the prosecutor elected not to immediately file charges in Superior Court related to the arrest.

to forfeiture] to its rightful owner . . . , the Property Clerk shall obtain the certification of the United States Attorney for the District of Columbia . . . that the property is not needed as evidence in the prosecution of a crime."). MPD is responsible for obtaining the USAO's signature before releasing the property. JA 84 ("When the decision is made not to paper a case, the [MPD] member shall have the reviewing attorney sign the PD Form 81-C releasing the property."); JA 84 ("If a disposition is available in the case, or the property is no longer needed for prosecution, the member shall submit a completed PD Form 81-C containing the signature of the appropriate prosecuting attorney."); JA 84 ("After 60 days, if there is no defendant or suspect in a case, and it is evident that the property will not be needed in court, the member who initially handled the property shall prepare and submit a properly signed PD Form 81-C to their element's property officer."); PDS Br. 12 (noting that the USAO must indicate on the form that property can be released when a case is no papered).

A person aggrieved by the deprivation of their property may file a motion for its return in Superior Court pursuant to Criminal Rule 41(g). Like its federal analogue, *see* Fed. R. Crim. P. 41(g), Criminal Rule 41(g) provides that "[t]he court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose

reasonable conditions to protect access to the property and its use in later proceedings." D.C. Super. Ct. Crim. R. 41(g).

## 2.    Factual Background.

Plaintiffs' putative class action complaint in *Cameron v. District of Columbia* and their complaint in *Asinor v. District of Columbia* allege the following facts.

MPD officers arrested the five named plaintiffs in *Cameron*—Alexander Cameron, Benjamin Tan, Destiny Robinson, Jonah Angeles, and Jake Oster—for alleged felony rioting at a protest in mid-August 2020, along with three dozen other people. JA 18, 126. Officers seized the cell phones and other personal property these arrestees had with them at the time of their arrests. JA 18. There is no claim that the arrests and seizures of property were unlawful. JA 35-39. The *Cameron* plaintiffs were kept overnight and then released the next day after the USAO no papered their cases. JA 19.

Through counsel, the *Cameron* plaintiffs contacted the USAO and MPD multiple times about return of their property. JA 20. An Assistant United States Attorney ("AUSA") told them that the USAO did not handle the release of property seized by MPD during a no-papered arrest. JA 20. Plaintiffs were told by MPD that the case was being actively investigated, and evidence that "may or may not include cell phones" was being reviewed and search warrants may be presented to the USAO. *Id*.

Three of the named *Cameron* plaintiffs filed Rule 41(g) motions in Superior Court for return of their property.  JA 22.  Although the complaint does not allege how the Rule 41(g) motions were resolved, two plaintiffs had their cell phones returned within a few months of filing their motions, and about 9 to 10 months after their arrests.  JA 22.  Several weeks after the Rule 41(g) motions were filed, an AUSA informed counsel that, around the time the motions were filed, she had filed the necessary forms for the release of property.  JA 22.  The other named plaintiffs' phones have now been returned.  Br. 7.

MPD officers arrested one of the named plaintiffs in *Asinor*—Oyoma Asinor, a photojournalist—at a different protest in late August 2020.  JA 53.  The complaint does not specify the charge on which he was arrested.  Officers seized the personal property Asinor had with him at the time, which included his cell phone.  JA 53.  Again, there is no claim that the seizure of property was unlawful.  *See* JA 66-67.  Like the *Cameron* plaintiffs, Asinor was detained overnight and released the next day, after the USAO no papered his case.  JA 53.

When Asinor went to recover his property after his release, an MPD officer told him his property was being kept as evidence.  JA 53.  Asinor contacted other

MPD officers and the USAO multiple times but received the same response.  JA 53.
MPD eventually allowed him to collect his property 11 months later.  JA 54.[2]

## 3.    Procedural History.

In both *Cameron* and *Asinor*, plaintiffs sued the District under 42 U.S.C.
§ 1983 for violating the Fourth Amendment through "a policy, pattern, practice, or
custom of retaining cell phones seized from arrestees, where officers have no reason
to believe that the cell phone constitutes physical evidence of a crime or contains
contraband, for longer than reasonably necessary for any legitimate law enforcement
purpose."  JA 25, 55; *see* 35-36, 66-67.  In support, they alleged that a 2019 report
from MPD's Office of Police Complaints and a 2016 article in *The Atlantic*
highlighted the alleged custom.  JA 28-29, 58.  They also alleged, as "[e]xamples of
prolonged retentions" of property, that "many" of the 200 people arrested at the 2017
presidential inauguration demanded return of their phones even though "most"
criminal charges were ultimately dropped, but the government did not return the
phones for at least eight months.  JA 25-26, 56-58.  And they alleged a handful of
other examples of prolonged retention of cell phones from 2018 to 2020—the *Asinor*
complaint included the allegations in *Cameron*, and vice versa—and that MPD had

---

[2]    Bryan Dozier, the other plaintiff in the *Asinor* action, makes no claim
regarding the recovery of his personal property.  JA 62-68.  He brought only local
law claims over which the district court declined to exercise supplemental
jurisdiction.  JA 155-56.

"a large plastic bin full of seized cell phones."  JA 26-28, 55-58.  Plaintiffs sought damages and injunctive and declaratory relief.  In addition, they sued the District under the Fifth Amendment for the allegedly inadequate process by which they could contest the retention of their property.  JA 37-38, 67.  They also brought local law claims against the District for conversion.  JA 38-39, 67-68.

The *Asinor* and *Cameron* complaints had a few notable differences.  For one, the *Cameron* plaintiffs brought their case as a putative class action on behalf of the three dozen other protestors arrested with them.  JA 31.  For another, in addition to Fourth and Fifth Amendment claims and a local law claim for conversion, the *Asinor* plaintiffs brought  local law claims against individual MPD officers and the District for violations of the First Amendment Assemblies Act and for assault and battery related to MPD's alleged use of chemical irritants against protestors.  JA 62-66.

On August 29, 2022, the district court (Judge Mehta, in both cases) granted the District's motions to dismiss.  JA 126-51, 153-56.  The court held, consistent with several other circuit courts of appeals, that the Fourth Amendment is not implicated by the government's prolonged retention of property after a lawful seizure.  JA 130-36, 154.  The court began by summarizing the holdings of the many circuits that have rejected plaintiffs' Fourth Amendment theory.  JA 130-33.  It then addressed the trio of Supreme Court cases plaintiffs relied on—*United States v. Place*, *United States v. Jacobsen*, and *Segura v. United States*.  JA 133-35.  The court

explained that those cases—which respectively concern a *Terry*-type investigatory seizure of luggage, the destruction of suspected drugs as part of a field test, and an agreement (not a holding) by six justices that a seizure reasonable at its inception can become unreasonable due to its duration—do not suggest that the Fourth Amendment is implicated by the failure to return lawfully seized property. JA 133-35. Judge Mehta also explained that cases assessing the reasonableness of a delay in seeking a search warrant do not undermine the rule applied by the majority of circuits because those cases address the manner of executing a search of seized property, not the Fourth Amendment implications of a property's prolonged retention. JA 135-36. As a result, the court held that plaintiffs did not state a Fourth Amendment claim.

Judge Mehta also dismissed what he saw as plaintiffs' "alternative" Fourth Amendment theory—that the District has a custom of unreasonable delay in seeking a search warrant for lawfully seized items. JA 136-39, 154. Plaintiffs relied on an email in the *Cameron* case from two weeks after the arrests where an MPD detective told plaintiffs that evidence "which may or may not include cell phones" was "being reviewed and . . . Search Warrants may be presented." JA 137 (quoting JA 20). Plaintiffs therefore argued that "[t]he sole justification MPD offered for its prolonged retention of Plaintiffs' phones was its need to determine whether to pursue a warrant to search them." JA 137 (internal quotation marks omitted). Judge Mehta

assumed for the purposes of the motion to dismiss that "a 13-day wait (or perhaps here even longer) in obtaining a search warrant states a Fourth Amendment violation." JA 137. But the court explained that none of plaintiffs' examples plausibly established that the District had a custom of retaining arrestees' cell phones for prolonged periods in order to decide whether to seek a warrant to search them. JA 138. In particular, plaintiffs did not allege that any of the other examples of prolonged seizures were due to MPD's lack of diligence in pursuing a search warrant. JA 139. As the court explained, it was equally plausible that the failure to return property was the result of "simple negligence." JA 139.

Next, the district court dismissed plaintiffs' Fifth Amendment claims because Rule 41(g) provides adequate process for return of their property. JA 139-50, 155. The court found it "clear that the Superior Court has jurisdiction to hear motions for return of property [under that rule] even when a case, as here, is no papered." JA 141. Applying the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), the court determined that Rule 41(g) "satisfies the due process guarantee of the Fifth Amendment." JA 150.

Finally, the district court declined to exercise supplemental jurisdiction over the local law claims in both cases and denied the motion to certify the *Cameron* class as moot. JA 150-51, 155-56.

Plaintiffs filed a timely appeal on September 28, 2022, and this Court consolidated the two cases. Plaintiffs now challenge the dismissal of the Fourth Amendment claims and the local law claims, as well as the denial of the motion for class certification. Plaintiffs have not challenged the district court's dismissal of their Fifth Amendment procedural due process claims.

## STANDARD OF REVIEW

This Court reviews a Rule 12(b)(6) dismissal de novo. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128 (D.C. Cir. 2015). The district court's decision not to exercise supplemental jurisdiction over state-law claims is reviewed for abuse of discretion. *English v. District of Columbia*, 717 F.3d 968, 971 (D.C. Cir. 2013).

## SUMMARY OF ARGUMENT

1. As the overwhelming majority of circuit courts that have addressed this issue agree, the government's failure to return lawfully seized personal property does not implicate the Fourth Amendment. The Fourth Amendment protects the right to be free from unreasonable searches and seizures by the government. And a "seizure" of property has long been defined as a "taking possession." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021); *Tate v. District of Columbia*, 627 F.3d 907, 912 (D.C. Cir. 2010). Once the government took possession of plaintiffs' property here, upon their arrests and detention, the Fourth Amendment seizure was complete. The government's continued possession of plaintiffs' lawfully seized property is not a

"seizure," and the Fourth Amendment does not govern the government's storage or return of such property. Instead, the Due Process Clause governs the retention of lawfully seized property. That view has been adopted by the First, Second, Sixth, Seventh, Tenth, and Eleventh Circuits, and the Eighth Circuit has signaled its agreement too. Here, plaintiffs have not challenged that the government's initial seizure of their personal property was lawful. Nor have they challenged the district court's holding that Superior Court Criminal Rule 41(g) provides a constitutionally adequate procedure to challenge the continued retention of their property. This Court should follow the majority view of the circuits and decline to supplant constitutionally adequate state law procedures with a nebulous Fourth Amendment test.

In arguing to the contrary, plaintiffs rely on a trio of Supreme Court cases, circuit cases about unreasonably delayed search warrants, and cases about the seizure of persons. None are persuasive. First, the Supreme Court cases—*United States v. Place*, *United States v. Jacobsen*, and *Segura v. United States*—do not apply here. To be sure, *Terry*-type investigative stops premised only on reasonable suspicion and seizures whose manner of execution results in additional intrusions (like the permanent destruction of property) may be challenged under the Fourth Amendment. But none of that happened here. Second, cases suppressing evidence obtained as the result of an unreasonably delayed search warrant are similarly

12

unhelpful to plaintiffs because those cases are best understood as assessing whether a search warrant was unreasonable, not whether retention of property is a Fourth Amendment "seizure."  Third, plaintiffs' reliance on cases about the need for a continuing justification for the seizure of persons are also inapposite: the Supreme Court has clarified that seizure has a different meaning when applied to property as opposed to persons, and the temporal limitation that applies to "taking possession" of property does not necessarily apply to the seizure of persons.

Plaintiffs are left with the Ninth and Fourth Circuit's decisions holding that the Fourth Amendment governs retention of property after a lawful seizure.  But those cases, too, are unpersuasive.  They fail to grapple with the temporal limitation in the definition of seizure, and they are based on the same flawed understanding of Supreme Court and circuit precedent as plaintiffs' arguments.  The Fourth Circuit's unpublished decision has also been called into doubt by that court's more recent published decision favorably citing the majority of circuits' understanding of the temporal limitations of the Fourth Amendment with respect to a "seizure" of personal property.

2. Even assuming plaintiffs do state a Fourth Amendment claim for the government's failure to return their lawfully seized property, the district court's decision still must be affirmed because plaintiffs failed to plausibly allege municipal liability on the part of the District.  In particular, plaintiffs were required to allege

that the retention of their personal property was caused by a District custom of retaining lawfully seized property longer than reasonably necessary for a legitimate law enforcement purpose. Such custom must have been so consistent and widespread that a District policymaker "could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). Plaintiffs' allegations cannot meet that high bar.

Although plaintiffs cite a D.C. Office of Police Complaints report and a magazine article to show that the custom existed, these sources are largely about civil forfeiture and lost or damaged property, not the government's intentional retention of cell phones without any law enforcement purpose. And although plaintiffs' complaints suggest there have been 200-some examples of this unlawful retention, their allegations that "many" people's cell phones were not returned despite their requests—even though "most" criminal charges were dropped—do not present the "concentrated, fully packed, precisely delineated scenarios" required to allege municipal liability. *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (internal quotation marks omitted). Nor do they amount to a sufficiently widespread practice to allow the Court to properly infer that the practice was adopted by a District policymaker, especially given the tens of thousands of arrests MPD conducts every year. Finally, plaintiffs did not sufficiently allege that the various

14

alleged examples of unlawful retention were intentional, as opposed to negligent or inadvertent. As a result, this Court should affirm the dismissal of the Fourth Amendment claims because of plaintiffs' failure to adequately allege municipal liability. And with all the federal claims dismissed, the Court should affirm the district court's decision not to exercise supplemental jurisdiction over the remaining local law claims.

## ARGUMENT

### I.    As The Overwhelming Majority Of Circuit Courts That Have Addressed This Issue Agree, The Government's Failure To Return Lawfully Seized Property Does Not Violate The Fourth Amendment.

The Fourth Amendment protects the people's "right . . . to be secure" from the government's "unreasonable searches and seizures" of "their persons, houses, papers, and effects." U.S. Const. amend. IV. The Supreme Court has long defined a seizure of personal property as "a taking possession," *Torres*, 141 S. Ct. at 995, in which "there is some meaningful interference with an individual's possessory interests in that property," *United States v. Miller*, 799 F.3d 1097, 1102 (D.C. Cir. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Everyone agrees that under that definition, the government here seized plaintiffs' cell phones and other personal property when plaintiffs were arrested and taken into custody. Plaintiffs do not challenge that at the time the government took possession of the property, the seizure was reasonable under the Fourth Amendment.

15

Nor does the government contest its ultimate obligation to return property once it is no longer needed as evidence.  Given these areas of agreement, this case would seem to involve only the adequacy of procedures for ensuring return of the property.  But the district court already found that those procedures are constitutional under the Due Process Clause, and plaintiffs do not challenge that determination on appeal.

Instead, plaintiffs ask this Court to decide whether the alleged failure to timely return their property states a claim under the Fourth Amendment.  It does not, as the district court and a decisive majority of circuit courts of appeals that have addressed the issue have held.  A "seizure" of property subject to the Fourth Amendment is a temporally limited act that, with rare exceptions not implicated here, does not extend past the moment where the government takes possession of the property.  The District's obligation to provide fair procedures to ensure return of the property once it no longer has a lawful purpose to retain it is a question of due process, not the Fourth Amendment.  That understanding is supported by Supreme Court and appellate precedent, and this Court should confirm it.

### A.    A "seizure" is a temporally limited act that, in these cases, ended before the failure to return property.

"[W]hen speaking of property, '[f]rom the time of the founding to the present, the word "seizure" has meant a "taking possession."'"  *Torres*, 141 S. Ct. at 995 (quoting *California v. Hodari D.*, 499 U.S. 621, 624 (1991)).  This Court relied on that definition in *Tate v. District of Columbia*, explaining that although the

16

government's initial towing and impounding of a vehicle was "a taking possession" subject to the Fourth Amendment, its subsequent disposal of that vehicle (by selling it) was not a "seizure" because the vehicle was "already in the District's lawful possession and control." 627 F.3d at 912. Indeed, the Supreme Court has repeatedly (and recently) recognized that "[a] seizure is a single act, and not a continuous fact." *Torres*, 141 S. Ct. at 1002 (quoting *Hodari D.*, 499 U.S. at 625) (in turn quoting *Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 471 (1874))). It is "[p]ossession, which follows seizure, [that] is continuous." *Thompson*, 18 Wall. at 471.

Under a straightforward application of the word "seizure," plaintiffs' property was "seized"—that is, the government "t[ook] possession" of it—when plaintiffs were arrested. *See* JA 19, 53. There is no dispute that those seizures were lawful when they occurred. The government's continued *possession* of the plaintiffs' property, and failure to return it, are not "seizures," and so cannot be challenged under the Fourth Amendment.

In response, plaintiffs suggest that "the reason for the Fourth Amendment's protection against unreasonably extended seizures [is] to safeguard the owner's possessory interests in regaining the seized property." Br. 17. But both the premise and conclusion of that statement are incorrect. The Fourth Amendment does not protect against "extended seizures" of personal property, but against the infringement of possessory interests in the first place. *See Soldal v. Cook County*,

17

506 U.S. 56, 69 (1992) (the Fourth Amendment protects "the intrusion on the people's security from governmental interference").  Without question, the Fourth Amendment is implicated if the government's seizure of property was unreasonable.  But nothing in its text, purpose, or history suggests that it is meant to provide a remedy for all claims affecting property interests or to regulate the retention and disposal of lawfully seized property.[3]

Seven of the nine circuit courts to have addressed the question have agreed that claims like plaintiffs' do not implicate the Fourth Amendment.  The Seventh Circuit reached this conclusion in *Lee v. City of Chicago*, explaining that "at the time of the amendment's drafting, the word 'seizure' was defined as a temporally limited act, one involving the 'confiscation or forcible taking possession (of land or goods); a sudden and forcible taking hold.'"  330 F.3d 456, 462 (7th Cir. 2003) (citing, e.g., *Hodari D.*, 499 U.S. at 624).  As a result, "[o]nce an individual has been meaningfully dispossessed, the seizure of the property is complete, and once

---

[3]     In their amicus brief, the Fourth Amendment scholars locate a "remedy of return of property in the Fourth Amendment."  Scholars' Br. 27, 28 & n.5.  But the cases they cite, including their lead case *Weeks v. United States*, 232 U.S. 383 (1914), support the District's point.  Such cases hold that property "wrongfully seized" in violation of the Fourth Amendment and intended to be used as evidence by the government in a criminal trial cannot be used against the defendant and must instead be returned to him.  *See id.* at 398.  Return of property is, of course, an appropriate remedy for an unreasonable seizure.  But nothing in the many cases cited suggests there is a separate, freestanding Fourth Amendment right to return of lawfully seized items.

justified by probable cause, that seizure is reasonable." *Id.* at 466. "The amendment then cannot be invoked by the dispossessed owner to regain his property." *Id.*; *see Conyers v. City of Chicago*, 10 F.4th 704, 710 (7th Cir. 2021) (recognizing that, as in *Lee*, the question "whether the City had a duty to release the property [belonging to an arrestee] sooner, or on more favorable terms," did not fall under the Fourth Amendment).

The Sixth Circuit reached the same conclusion, for similar reasons. In *Fox v. Van Oosterum*, the court explained that a county official's alleged refusal to return a driver's license seized in an inventory search did not implicate the Fourth Amendment. 176 F.3d 342, 351 (6th Cir. 1999). The court noted that the Supreme Court cases addressing seizures of property "all concern state actors' role in *taking possession* of property." *Id.* at 350. The court then held that the official's action could not be "characterized as a seizure in the sense of taking away property from its owner" because "the Fourth Amendment protects an individual's interest in retaining possession of property but not the interest in regaining possession of property." *Id.* at 351.

The First, Second, and Eleventh Circuits have issued published decisions in agreement. *See Denault v. Ahern*, 857 F.3d 76 (1st Cir. 2017); *Shaul v. Cherry Valley Springfield Cent. Sch. Dist.*, 363 F.3d 177 (2d Cir. 2004); *Case v. Eslinger*, 555 F.3d 1317 (11th Cir. 2009). The Tenth Circuit has issued an unpublished

decision in agreement. *See Snider v. Lincoln Cnty. Bd. of Cnty. Comm'rs*, 313 F. App'x 85 (10th Cir. 2008). And the Eighth Circuit has indicated its agreement in a published decision, though ultimately disposing of the claim on qualified immunity grounds. *See Gilmore v. City of Minneapolis*, 837 F.3d 827 (8th Cir. 2016). District courts in the Third and Fifth Circuits have also agreed with the District's position. *See Hammond v. Lancaster City Bureau of Police*, No. 17-cv-1885, 2021 WL 5987734, at *4 (E.D. Pa. Dec. 16, 2021); *Reliford v. Craig*, No. 2:16-cv-482, 2017 WL 6372634, at *6 (S.D. Tex. Nov. 22, 2017); *cf. Mitan v. U.S. Postal Inspection Serv.*, 656 F. App'x 610, 614 15 (3d Cir. 2016) (explaining that no precedent clearly established "a Fourth Amendment duty on officers to return property that was lawfully seized by consent when, months later, the consenter loses authority (or apparent authority) over the property by virtue of an intervening court decision").[4]

## B. The Due Process Clause governs the retention of lawfully seized property.

Although plaintiffs do not have a Fourth Amendment claim, they may have still had a constitutional remedy through the Fifth Amendment's Due Process Clause. The Fourth Amendment is not "the beginning and end of the constitutional inquiry whenever a seizure occurs." *United States v. James Daniel Good Real Prop.*,

---

[4]     On the other side of the ledger, only two circuits apply the minority rule that plaintiffs support. *See Brewster v. Beck*, 859 F.3d 1194 (9th Cir. 2017); *Mom's Inc. v. Willman*, 109 F. App'x 629 (4th Cir. 2004). The flaws in those decisions are discussed *infra*, Part I.D.

510 U.S. 43, 51 (1993). Although, as explained above, the Fourth Amendment is not implicated once a lawful seizure is complete and the government has "tak[en] possession" of the property, *Torres*, 141 S. Ct. at 995, the District agrees that it has an ultimate obligation to return the property at issue and that it must provide fair procedures for plaintiffs to seek their property's return. Indeed, this Court has described the return of property to its rightful owner not as sounding in the Fourth Amendment's protection of the people's right "to be secure," but rather as "fundamental to the integrity of the criminal justice process." *United States v. Wilson*, 540 F.2d 1100, 1103 (D.C. Cir. 1976).

The Supreme Court considered a similar scenario in *City of West Covina v. Perkins*, 525 U.S. 234 (1999). There, like here, police seized plaintiffs' personal property, and plaintiffs quickly sought its return. And there, like here, "no one contest[ed] the right of the State to have seized the property in the first instance or its ultimate obligation to return it." *Id.* at 240. Given the absence of any such dispute, the Supreme Court concluded that "rules restricting the substantive power of the State to take property are not implicated by this case." *Id.* Instead, "[w]hat is at issue is the obligation of the State to provide fair procedures to ensure return of the property when the State no longer has a lawful right to retain it." *Id.* (holding that state law remedies for return of the property satisfied due process despite allegedly inadequate notice of those procedures).

21

As the government explained and the district court agreed, in the District, Superior Court Criminal Rule 41(g) satisfies that due process right. JA 139-50, 155. Rule 41(g) provides that "[a] person aggrieved by . . . the deprivation of property may move for the property's return." The district court concluded that the rule applies here, even where the underlying criminal case has been no papered, and that the rule's procedures comport with due process. JA 139-51, 154. Plaintiffs have not challenged that conclusion on appeal.

To be sure, as plaintiffs argue, "[c]ertain wrongs affect more than a single right." Br. 50 (quoting *Soldal*, 506 U.S. at 70). But the retention of lawfully seized property is simply not one of those wrongs. That conclusion also makes sense. The Rule 41(g) procedure has benefits that a Fourth Amendment reasonableness analysis would not. As the Sixth Circuit explained in *Fox*, "the well-developed procedural due process analysis . . . provides the states with the first chance to prevent possible constitutional wrongs" while "a new, uncertain Fourth Amendment analysis [would] allow[] litigants to jump straight to federal court every time a state official refuses to return property that was, at least at one point, lawfully seized or lawfully in the state's possession." 176 F.3d at 352. Indeed, plaintiffs' theory would greatly expand the Fourth Amendment to cover any retention of lawfully seized personal property— not only when seized incident to arrest, but also when lost or abandoned or otherwise

22

lawfully obtained by the government in its community caretaking function. *See, e.g.*, D.C. Code § 5-119.02; JA 71.

The untenable result of applying plaintiffs' rule would be to constitutionalize what would otherwise be state-law determinations and, in all likelihood, replace them with federal-court determinations in every case. *See Fox*, 176 F.3d at 352. This would be true even when there are multiple or questionable claims on the property that require time for the government to resolve. *See id*. Such disputes need not always become federal, constitutional cases. As long as proper procedures exist, claims regarding retention of lawfully seized property can be addressed in state or local courts. *See* Super. Ct. Crim. R. 41(g). As the Seventh Circuit concluded, "allowing the analysis to proceed . . . under the [Fourth A]mendment's general reasonableness requirement[] would lead to an unwarranted expansion of constitutional law." *Lee*, 330 F.3d at 463 (internal quotation marks omitted). Several other circuit courts have therefore recognized that only the Due Process Clause applies to claims like plaintiffs' here. *See Denault*, 857 F.3d at 83-84; *Shaul*, 363 F.3d at 187; *Fox*, 176 F.3d at 351; *Bell v. City of Chicago*, 835 F.3d 736, 741-742 (7th Cir. 2016); *Snider*, 313 F. App'x at 93; *Case*, 555 F.3d at 1330; *see also Gilmore*, 837 F.3d at 838 (recognizing that a due process claim "may be an alternative avenue for redress").

C.    **The Supreme Court and this Court's precedents are consistent with the rule in the vast majority of circuits.**

1.    *Place*, *Jacobsen*, and *Segura* do not support plaintiffs' broad rule.

Plaintiffs rely on three Supreme Court cases—*Place*, *Jacobsen*, and *Segura*—for the "key principle[]" that "the Fourth Amendment governs the manner of executing a seizure—including its duration—not just its initiation." Br. 20. Their "second key principle" is that "a seizure's duration becomes unreasonable when the intrusion on the property owner's Fourth Amendment interests lasts longer than is reasonably justified by the government's legitimate objectives." Br. 22. These purported general "principles," however, far outstrip the limited holdings of the cases from which they are drawn. They have no application here.

All three of plaintiffs' Supreme Court cases deal with the government's role in taking possession of property, not its return of property. And they have little in common with plaintiffs' claims regardless. They should not be read broadly just because, as plaintiffs put it, they "announced their principles using broad language that extends beyond their immediate circumstances." Br. 31. As Chief Justice Marshall wrote long ago, "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used," *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821), and this Court has explained that "[a] respect for *stare decisis* does not require the most expansive application of principles

24

enunciated in a prior decision," *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992).

Decided in 1983, *Place* concerned whether a 90-minute seizure of a traveler's personal luggage for a dog sniff for drugs exceeded the permissible limits of a *Terry*-type investigative stop.  462 U.S. 696, 700 (1983).  Notably, *Place* did not reason that the seizure was lawful and completed, and that the government simply kept the luggage in its possession for too long.  The Court held instead that this particular type of seizure was necessarily limited in duration from the outset because it was a *Terry*-type investigative stop authorized only by reasonable suspicion, not probable cause.  *Id.* at 706.  And because "such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return," "when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause."  *Id.* at 708-09.  Nothing in plaintiffs' claims raise the unique concerns of a *Terry*-type stop.  *Place* is therefore of little help.  *See Lee*, 330 F.3d at 464 (reasoning that "*Place* is ultimately concerned only with the initial loss of that possessory interest and whether the existence of probable cause renders that loss reasonable" and therefore "[i]t has no application after probable cause to seize has been established").

The following year, the Supreme Court decided *Jacobsen*, which involved a seizure of a package based on probable cause, and which plaintiffs argue shows that *Place* applies beyond its *Terry*-type facts.  Br. 45.  But *Jacobsen*, too, has limitations that make it a weak foundation for plaintiffs' Fourth Amendment framework.  The *Jacobsen* Court held that even though the government had lawfully seized a package, its destruction of part of its contents—in order to conduct a field test for drugs—could have been unlawful because it "converted what had been only a temporary deprivation of possessory interests into a permanent one."  466 U.S. at 124-25.  The destruction was ultimately reasonable, the Court concluded, "because only a trace amount of material was [destroyed], . . . and [because] the property had already been lawfully detained."  *Id.* at 125.  It was in this context that *Jacobsen* described *Place* as holding that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes a possessory interest protected by the Fourth Amendment."  466 U.S. at 124.

None of that suggests that the government's mere failure to timely return property constitutes a "manner of execution" of a seizure, equivalent to the permanent destruction of property, that implicates the Fourth Amendment.  And as *Jacobsen* itself acknowledges, the case was not really about a single continuing seizure, but rather a seizure that irrevocably changed from temporary to permanent after an "additional intrusion"—the field test for drugs.  466 U.S. at 122.  It was not

26

the length of the continued retention of the property that mattered, but that the "manner of execution" included an "additional intrusion"—a permanent destruction—that changed the fundamental character of the original seizure. By contrast, the seizure that plaintiffs challenge here was not affected by any comparable "manner of execution" and had no "additional intrusion."

Decided three months after *Jacobsen*, *Segura* is even less illuminating. That case concerned the seizure of a residence (and thus all of its contents) from inside the home by officers awaiting a search warrant. 468 U.S. 796, 798 (1984). The Court affirmed the denial of a motion to suppress evidence obtained in executing the warrant. *Id.* at 804, 816. According to plaintiffs, *Segura* "reaffirmed" the principle in *Place* and *Jacobsen*, Br. 22, because six justices (four in dissent, two in a portion of the opinion that no other justice joined) cited *Place* to say that a seizure reasonable at its inception can become unreasonable because of its duration and analyzed whether police could reasonably occupy a home for 19 hours until they obtained a warrant to search it. 468 U.S. at 806-13 (opinion of Burger, C.J.), 823-24 (Stevens, J., dissenting). But it is hard to infer much from those statements, which were not part of the Court's majority opinion. Five justices joined in the judgment, and the judgment upheld the validity of the search warrant despite the 19-hour delay between the seizure of the residence and the issuance of the warrant. *See id.* at 798. But because there was no majority opinion on the issue and therefore no principle or

reasoning given for that aspect of its decision, *Segura* is of no precedential value here.  To the extent the statements not found in the majority opinion in *Segura* have any bearing on plaintiffs' claims in these cases, they fail to persuade for the same reason as the delayed search warrant cases discussed *infra*, Part I.C.2.

> 2.    The cases challenging a delayed search warrant do not support plaintiffs' rule.

In support of their argument that the Fourth Amendment is implicated by the failure to return lawfully seized property, plaintiffs also cite cases holding that a search of property already seized violates the Fourth Amendment when the government unreasonably delays in obtaining the search warrant.  Br. 24-27, 42-43.

Reliance on those cases is misplaced.  To start, they are inapplicable on a very basic level: every single case that plaintiffs cite is a criminal case where the defendant moved to suppress evidence obtained as the result of a search warrant. *See* Br. 24-27 (citing cases), 42-43 (same).  Here, of course, there was no search that violated the Fourth Amendment because there was no search at all.  The complaints here lack those obvious Fourth Amendment hooks.

More to the point, the reasoning of the delayed-warrant cases does not apply here either.  As then-Judge Gorsuch pointed out, the suppression motions at issue required the court to assess the reasonableness of the *search warrant*, not just the seizure of the property in the first instance.  *See United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013).  In *Christie*, the Tenth Circuit addressed whether evidence

obtained from the search of a computer should be suppressed. *Id.* at 1161-62. "To be precise, [there was no] question whether the government's *seizure* of the computer satisfied the Fourth Amendment" because the government "took possession of the computer" with the co-owner's consent. *Id.* at 1162. Instead, the court explained, the defendant's Fourth Amendment argument "attack[ed] the propriety of the two *searches* the government undertook once it had control of the computer." *Id.* "To justify its searches[,] the government . . . point[ed] to a pair of warrants it sought and received, one for each search." *Id.* *Christie* then made the point plainly: "It is these warrants Ms. Christie challenges, arguing they were issued in defiance of the Fourth Amendment." *Id.* According to the defendant, the "investigative delay—between seizure and search—was constitutionally impermissible, should have precluded any warrant from issuing, and itself requires the suppression of everything the government found." *Id.*

Of course, assessing the reasonableness of a search pursuant to a warrant requires assessing "the totality of the circumstances," *id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)), and those circumstances can include the delay between a seizure and a search (among many other things). But it does not follow that the Fourth Amendment is implicated whenever the government fails to return

29

lawfully seized property, just because the Fourth Amendment is implicated if the government later searches that property.[5]

The Seventh Circuit made a similar point in *United States v. Burgard*, 675 F.3d 1029 (7th Cir. 2012). In discussing how the delayed-warrant line of cases was consistent with its ruling in *Lee* that failure to return lawfully seized property does not implicate the Fourth Amendment, the court explained that the challenge to the delayed warrant was a challenge to a "new search and seizure" involving the contents of the seized phone, not to the government's retention of the phone itself. *Id.* at 1032. The Seventh Circuit is not alone. As plaintiffs acknowledge, the other circuits that followed *Fox* and *Lee* in finding no Fourth Amendment claim in the government's failure to return lawfully seized property also assess the reasonableness of delayed search warrants under the Fourth Amendment with no apparent difficulty. *See, e.g.*, *United States v. Laist*, 702 F.3d 608, 610 (11th Cir. 2012) (reviewing "the totality of the circumstances presented by this case, which

---

[5]   To be sure, a reader of these delayed-warrant cases could focus on quotes about the reasonableness of an "extended" seizure. *See, e.g.*, *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019) ("The constitutional question is whether the extended seizure of Pratt's phone was reasonable."); *see* Br. 24-26. But that removes important context: the reasonableness of the duration between seizure and search is relevant in these cases only to assess the reasonableness of the search itself. To determine the search's validity, courts balance the time elapsed from the initial seizure against the government's "justification for the delay *in obtaining a search warrant*." *Id.* at 272 (emphasis added).

indicates that the government acted reasonably in obtaining the search warrant at issue"); *United States v. Smith*, 967 F.3d 198, 211 (2d Cir. 2020) ("The delayed search of Smith's tablet was unreasonable in violation of the Fourth Amendment."). Plaintiffs criticize these circuits for failing to offer a "logical explanation why the warrant context receives special treatment." Br. 48.  As *Christie* noted, these cases do not provide the search warrant context with special treatment, but normal treatment—the ultimate object of the Fourth Amendment challenge is the reasonableness of the search (based on the totality of circumstances), not the government's retention of the property following its seizure. 717 F.3d at 1162.

Again, nothing in *Segura* contradicts that understanding.  That case dealt with government occupation of a home, which goes against "[t]he very core of [the Fourth Amendment's] guarantee." *Caniglia v. Strom*, 141 S. Ct. 1596, 1599 (2021).  And as previously noted, the six justices who stated in *Segura* that "a seizure reasonable at its inception because [it is] based upon probable cause may become unreasonable as a result of its duration" did not do so as part of the Court's majority opinion, let alone its holding.  But even considering those statements, they were made addressing a claim that evidence should be suppressed as the product of an illegal search, because it was obtained after officers occupied the defendants' home for 19 hours in order to procure a search warrant.  *See* 468 U.S. at 812-13, 822-24.  As discussed, such cases have little bearing on plaintiffs' claims here.

31

Plaintiffs argue that the Supreme Court's decision in *Soldal* cannot be squared with the position that individuals could invoke the Fourth Amendment against officers who lawfully seize their property and then search it, but not against officers who lawfully seize their property and never seek a search warrant. Br 33. But that outcome is driven by the temporally limited definition of seizure, and the fact that a search is a separate intrusion. Besides, the Supreme Court's decision in *Soldal* is consistent with the District's position. There was a seizure in *Soldal* when there was a "taking possession" by the government that meaningfully interfered with the Soldals' possessory interests—the state actors "unceremoniously dispossessed" the Soldals of their mobile home by towing it away. 506 U.S. at 61, 72. And *Soldal* emphasized that the Fourth Amendment protects against "*intrusion* on the people's security from governmental interference," regardless of whether the intrusion is for a law enforcement purpose or not. *Id.* at 69 (emphasis added). *Soldal* does not displace the "taking possession" definition of seizure of property or suggest that the Fourth Amendment's prohibition on unreasonable seizures is implicated by a continuing possession.

> 3. Cases about seizures of persons are not applicable here.

Next, plaintiffs urge the Court to stretch the definition of "seizure" by applying cases about seizures of persons to seizures of property. *See* Br. 36-40; MacArthur Br. 15-17. They argue that, because "persons, papers, and effects" are

each given equal billing in the Fourth Amendment's text, and because the government must end the seizure of a person when its justification for the seizure expires, the same should be true of plaintiffs' cell phones and other personal property. Br. 39-40. But people and property are not analogous. The Supreme Court applies a different definition of "seizure" for each, and with good reason.

The Supreme Court in *Torres* took great pains to distinguish the seizure of a person from the seizure of property, even though "persons" and "effects" appear together in the Fourth Amendment. *Torres* addressed whether the application of physical force to the body of a person with intent to restrain is a "seizure" of the person, even if the force does not succeed in subduing the person. *See* 141 S. Ct. at 994. The Court agreed that "the Framers selected a term—seizure—broad enough to apply to all the concerns of the Fourth Amendment," including persons and effects. *Id.* at 995. "[W]hen speaking of property," the Court explained, "from the time of the founding to the present, the word seizure has meant a taking possession." *Id.* (internal quotation marks omitted). But that definition does not apply to a person. "As applied to a person, the word seizure readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Id.* (internal quotation marks and alterations omitted).

For that reason, the Court held, a seizure of a person is of a different character—and requires much less—than the "taking possession" required for a

33

seizure of property. To seize a person, what counts is the application of force with intent to restrain or a show of authority that in some way restrains the liberty of the person, even if the officer does not secure control over the arrestee. *Id.* at 995. Rather than being "a schizophrenic reading of the word seizure," the distinction between a seizure of property and a seizure of a person "demonstrate[s] the unremarkable proposition that the nature of a seizure can depend on the nature of the object being seized." *Id.* at 1002 (internal quotation marks omitted). Indeed, if the definition of seizure that applies to persons applied to property, then the government could "seize" property within the meaning of the Fourth Amendment merely by touching the property with an "intent to restrain," *id.* at 995, even if it never took possession or meaningfully interfered with a possessory interest. That is obviously not a workable rule—what would it mean "to restrain" an inanimate object?—and it has no basis in the common law history of seizure of property.[6]

---

[6]    Plaintiffs' invocation of founding era common law actions for detinue and trover is not persuasive. Br. 34-36. The fact that actions like detinue and trover existed at common law does not mean that the retention of property would have been "regarded as an unlawful . . . seizure under the common law when the [Fourth] Amendment was framed." *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999). The Fourth Amendment should not be read to incorporate all those various causes of action. *Cf. Hudson v. Palmer*, 468 U.S. 517, 540 (1984) (O'Connor, J., concurring) (explaining that certain torts "have long been redressable . . . by actions for detinue" although they have not "ever been thought to state a Fourth Amendment claim"). And defining a "seizure" to include retention of property does not "square[] with [the] recognition that a seizure is a single act, and not a continuous fact." *Torres*, 141 S. Ct. at 1002 (internal quotation marks and alterations omitted).

It also makes sense that a seizure of a person would not have the same temporal limitation as the "taking possession" of property. The Supreme Court has acknowledged that one difference between the "nature of a seizure" of a person versus property is that a person is "capable of fleeing and [has] an interest in doing so." *Id.* at 1002. The duration of a seizure of a person could (but need not always) be continuous, because the government may need to continually overcome the person's freedom to leave. The same is not true of a cell phone. It may be integral to our daily lives, but it has no free will. And although the government's possession of the cell phone may continue, the "taking possession" that intrudes on the owner's possessory interest—the actual "seizure"—can fairly be said to happen only once (barring any additional intrusion like the intentional destruction of that property).

This Court recognized that "taking possession" was key to the definition of a seizure of property in *Tate*. 627 F.3d at 912 (holding that the sale of a vehicle "already in the District's lawful possession and control" was not a "seizure," citing the "taking possession" definition). Contrary to plaintiffs' suggestion, the *Tate* Court did not need "guidance," Br. 38 n.2, from *Rodriguez v. United States*, 575 U.S. 348 (2015), and *Manuel v. City of Joliet*, 580 U.S. 357 (2017)—cases about seizures of *persons*—to recognize that a seizure of *property* requires "a taking possession." *Torres* confirmed as much last Term. 141 S. Ct. at 995. And despite plaintiffs' criticism of the scope of the Court's analysis of the Fourth Amendment issue in *Tate*,

the Court's conclusion that a sale of a vehicle already in the District's lawful possession and control was not a "seizure" was not "dicta." Br. 38 n.2. It was the basis on which the Court disposed of the Fourth Amendment claim. *Tate*, 627 F.3d at 912.

Plaintiffs' seizure-of-persons cases are therefore inapposite. *Rodriguez* is about the permissible length of a traffic stop, not the seizure of property. The Court did not analyze any "taking possession" or "meaningful interference with possessory interests"—instead, it focused on the "mission" of the traffic stop, which was the justification for detaining the driver. 575 U.S. at 355-57. The Court concluded that a routine traffic stop is analogous to a *Terry* stop and cannot be extended without reasonable suspicion. *Id.* at 354. At most, *Rodriguez* might apply to seizures of property in the same way *Place* does, since both are exceptions for *Terry*-type investigative detentions. But it does not suggest anything more.

*Manuel v. City of Joliet* is even further afield. That case asked whether a pretrial detainee could challenge his detention under the Fourth Amendment on the ground that it was based solely on false evidence rather than supported by probable cause. 580 U.S. at 364. The Court easily concluded that Manuel's 48-day detention was a "seizure" of his person, reasoning that "[a] person is seized whenever officials restrain his freedom of movement such that he is not free to leave." *Id.* (internal quotation marks and alterations omitted). Like the other seizure-of-person cases,

that sheds no light on the temporal limitation on the "taking possession" of property. And even aside from that, the seizure in *Manuel* was allegedly *never* lawful, so it sheds little light on how the Fourth Amendment should treat retention of property after a lawful seizure. *Id.* Moreover, *Manuel* makes clear that there is a temporal limitation even for seizures of persons—the Fourth Amendment "drops out" at trial, and the Due Process Clause takes over. *Id.* at 369 n.8.[7]

This Court's recent decision in *Lin* is also about a seizure of a person and is similarly inapplicable. *See Lin v. District of Columbia*, 47 F.4th 828, 839 (D.C. Cir. 2022). The Court concluded there was a genuine dispute of material fact about whether probable cause to arrest Lin for simple assault had dissipated after the officers' on-scene investigation "uniformly discredited" the apparent victim of the assault, meaning that Lin's Fourth Amendment claim could proceed. *Id.* at 841. That Lin's arrest ("the quintessential seizure of the person," *Torres*, 141 S. Ct. at 995) continued to implicate the Fourth Amendment beyond the moment she was placed in handcuffs is not surprising—the arrest continually restrained Lin's liberty,

---

[7]    There is a significant question whether the Fourth Amendment similarly "drops out" with respect to excessive force claims brought by pretrial detainees (as opposed to arrestees)—another example of a Fourth Amendment temporal limitation in the seizure-of-persons context. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015) (analyzing pretrial detainee's excessive force claim under the Due Process Clause); *Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 n.2 (2021) (per curiam) (whether the Fourth or Fourteenth Amendment applies to pretrial detainees' excessive force claims has not been resolved).

amounting to an ongoing seizure. As discussed above, that reasoning does not suggest there is a similar ongoing seizure of property after the "taking possession" is complete. And even if the dissipation of probable cause to arrest had any application here, it would still not affect the District's seizure of plaintiffs' property—that the government chose not to proceed with formal charges against these plaintiffs does not mean there was no probable cause to arrest them or seize their property in the first place.[8]

### D.    The few court of appeals opinions to the contrary are not persuasive.

Against the weight of the First, Second, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuit decisions are two thinly reasoned decisions from the Ninth and Fourth Circuits. The Ninth Circuit's decision in *Brewster v. Beck*, 859 F.3d 1194 (9th Cir. 2017), which addressed whether a 30-day impound of a vehicle authorized

---

[8]    The other seizure-of-persons cases plaintiffs cite fare no better. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (explaining, like in *Rodriguez*, that a seizure of a person "justified solely by the interest in issuing a warning ticket to a driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission"); *Barnett v. MacArthur*, 956 F.3d 1291, 1297 (11th Cir. 2020) (concluding that "detention in jail is a type of seizure of the person to which Fourth Amendment protections attach" and remanding for trial on whether detaining a DUI suspect for eight hours after she blew a 0.000 on a breathalyzer was reasonable (internal quotation marks and alterations omitted)); Akhil R. Amar, Terry *and Fourth Amendment First Principles*, 51 St. John's L. Rev. 1097, 1121 (1998) (discussing *Money v. Leach*, an English case from 1765 about whether a four-day detention of a person allegedly based on insufficient probable cause was unreasonable).

by law was a seizure, does not reckon with the temporal limitations in the "taking possession" definition of seizure. *Id.* at 1195-97. Instead, *Brewster* acknowledged that the government's seizure of the plaintiff's vehicle was lawful under the community caretaking exception to the Fourth Amendment, *id.* at 1196, and even seemed to acknowledge that the seizure "ha[d] run its course" when the plaintiff sought return of her property, *id.* at 1197. But *Brewster* then relied on the same overly broad reading of *Place* refuted above, along with the inapplicable seizure-of-persons holding in *Manuel*, to conclude that the Fourth Amendment is implicated by a delay in returning property. *See id.* And it also relied on a prior Ninth Circuit decision, *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012), which held that the destruction of property (not the failure to return lawfully seized property) violated the Fourth Amendment. *Brewster*, 859 F.3d at 1197. No other court of appeals has followed *Brewster*'s approach in a published opinion.

The Fourth Circuit's unpublished decision in *Mom's Inc. v. Willman*, 109 F. App'x 629 (4th Cir. 2004), is not persuasive either. Like *Brewster*, it does not address the temporal limitations in the Fourth Amendment's definition of seizure of property. Nor does it even mention *Lee* or *Fox*. Instead, it relied on a Seventh Circuit case holding that a theft of a painting without authorization by a group of Chicago aldermen was a Fourth Amendment violation—obviously inapposite to the question of whether retention of property after a lawful seizure implicates the Fourth

Amendment. *See id.* at 637 (citing *Nelson v. Streeter*, 16 F.3d 145, 151 (7th Cir. 1994)). Notably, a more recent, published Fourth Circuit decision casts some doubt on *Mom's*. In *Smith v. Travelpiece*, 31 F.4th 878, 886 (4th Cir. 2022), the court examined the common law tort analogy to a Fourth Amendment unreasonable-seizure claim and held that the well-settled rule was that the claim "accrued at the time it was committed, and not from the time when the full extent of the injury was ascertained." *Id.* at 887 (internal quotation marks omitted). The Fourth Circuit cited favorably to *Fox* to explain that "[o]nce th[e] act of taking the property is complete, the seizure has ended." *Id.* That *published* decision from the Fourth Circuit reinforces that the Ninth Circuit's decision is an outlier.

## II. Even Assuming The Fourth Amendment Applies To A Failure To Return Lawfully Seized Property, Dismissal Is Proper Because Plaintiffs Failed To Adequately Allege Municipal Liability.

"To state a claim for relief against a municipality under section 1983, a plaintiff must satisfy two requirements: she must plead a predicate constitutional violation and that a custom or policy of the municipality caused the violation." *Blue v. District of Columbia*, 811 F.3d 14, 18 (D.C. Cir. 2015) (internal quotation marks omitted). Even assuming that the Fourth Amendment applies to a failure to return lawfully seized property (and that the District's conduct here violated the Fourth Amendment), plaintiffs have not adequately alleged that a District custom or policy caused the violation. Plaintiffs assert a "custom of retaining cell phones seized from

arrestees, where officers have no reason to believe that the cell phone constitutes physical evidence of a crime or contains contraband, for longer than reasonably necessary for any legitimate law enforcement purpose." JA 25, 55; *see* JA 35-36, 66-67. But their alleged examples of MPD's failure to return lawfully seized personal property do not amount to such a custom.

### A.    The Court can reach this question.

Plaintiffs are correct that the district court assessed, more narrowly, whether they had adequately alleged a District custom of unreasonably delaying search warrants, which the court characterized as plaintiffs' "alternative" theory. JA 134, 136-39; Br. 51. Plaintiffs, though, did not allege that unreasonably delaying applications for search warrants was the District's custom. They instead alleged that the District had a custom of retaining cellphones lawfully seized from arrestees "for longer than reasonably necessary for any legitimate law enforcement purpose." JA 25, 35-36, 55, 66-67.

If the Court reaches this question, it need not remand, but should instead address it in the interests of judicial efficiency. A failure to adequately allege municipal liability would be dispositive of the Fourth Amendment claim, for which the District is the sole defendant. *See Blue*, 811 F.3d at 18. The Court "can affirm a judgment on any basis adequately preserved in the record below." *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). The District

preserved this issue in the district court by challenging whether plaintiffs adequately alleged a custom of retention of personal property longer than reasonably necessary. *See* RD 19-1 at 10-13, *Cameron v. District of Columbia*, No. 21-cv-2908 (D.D.C.); RD 29 at 20-24, *Asinor v. District of Columbia*, No. 21-cv-2158 (D.D.C.).  Plaintiffs responded to that argument.  *See* RD 22 at 17-23, *Cameron*; RD 30 at 27-33, *Asinor*. And it is a legal question that this Court is well equipped to decide.  *See, e.g.*, *Blue*, 811 F.3d at 18-20 (assessing whether a plaintiff adequately alleged municipal liability at the motion-to-dismiss stage).

### B.    The standard for municipal liability is high.

"[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, the District can be held liable for constitutional violations committed by its employees only if a plaintiff shows that the District is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort.'"  *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell*, 346 U.S. at 691).  "Generally speaking, such an official policy exists when (1) the municipality adopts a policy that itself violates the Constitution; (2) the unconstitutional action was taken by a 'policy maker' within the government; (3) the employees' unconstitutional actions 'are so consistent that they have become [a] 'custom' of the municipality of which the supervising

policymaker must have been aware; or (4) the municipality knew or should have known of a risk of constitutional violations, but showed 'deliberate indifference' to that risk by failing to act." *Id.* (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

Plaintiffs have pursued only the third avenue—that the District's employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware. That is a high bar. The custom must be so consistent and widespread that the policymaker "could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988). To establish this, the plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997). "The only acts that count (though they may include inaction giving rise to or endorsing a custom) are ones by a person or persons who have final policymaking authority under state law." *Id.* (internal quotation marks omitted). In other words, "[t]o hold a municipality liable based on a pattern of similar constitutional violations, a plaintiff must show that the municipality knowingly ignored" a "persistent and widespread" practice that "was so engrained that it amounted to a standard operating procedure of which municipal policymakers must have been aware." *Hurd*, 997 F.3d at 338

43

(internal quotation marks and alterations omitted); *see Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450, 461 (8th Cir. 2009) ("Imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the [final policymaker] should have known of it.").  Plaintiffs' allegations are insufficient to meet that high bar.

### C.    Plaintiffs' allegations inadequately allege a custom of retention of lawfully seized personal property without any legitimate law enforcement purpose.

Plaintiffs' complaints assert various examples of the District's alleged custom.  Those examples are inadequate.

*First*, plaintiffs note that in 2019 the District's own Office of Police Complaints issued a report on MPD's handling of personal property.  JA 28, 58, 119-25.  The report noted that the office received about 50 complaints annually between 2015 and 2018 that could be divided into two basic categories: "(1) mistakes made during the course of custody that cause the loss or damage of property; and (2) property improperly seized or stolen from community members."  JA 121.  The report says nothing about plaintiffs' claim in this case—that MPD employees held onto lawfully seized property past the point that it was reasonably necessary for a law enforcement purpose.  JA 121-22.  Cell phones are not even mentioned.

*Second*, a 2016 article in *The Atlantic* does not adequately allege a custom of prolonged retention of personal property following a lawful seizure.  *See* JA 28, 58 (citing Kaveh Wendell, *Police Can Use a Legal Gray Area to Rob Anyone of Their Belongings*, The Atlantic (Aug. 15, 2016)).[9]  The article is primarily about civil asset forfeiture, an entirely separate process subject to its own constitutional requirements.  *See James Daniel Good Real Prop.*, 510 U.S. at 48-62.  Nor does it describe a District "custom."  It is mainly anecdotes and arguments from a handful of lawyers, mostly without details about whether prosecutions are ongoing or the property is being used as evidence.  And it is focused in significant part on problems with and reforms to the practices of the New York Police Department and Bronx District Attorney's office.

*Third*, a "large bin" of cell phones at MPD does not "strongly suggest[]" a custom of prolonged retention of property after it is reasonably necessary.  RD 22 at 18, *Cameron*.  Even with all reasonable inferences drawn in plaintiffs' favor, a large number of seized cell phones cannot support the existence of an unconstitutional "practice [that] is so widespread as to have the force of law."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).  It is just as plausible that the phones in the bin were abandoned, lost, or left unclaimed for a variety of reasons.  Allegations need

---

[9]    https://tinyurl.com/3vxpt5vb.

to plausibly suggest an entitlement to relief, not merely be consistent with it. *See*

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

*Fourth*, plaintiffs allege that "many" of the phones of 200-some arrested protestors at the 2017 presidential inauguration were not returned, despite requests, for at least eight months "even though any material relevant to the criminal charges arising out of that protest (most of which were ultimately dropped) could have been downloaded by the government expeditiously." JA 25, 56-57. But this does not plausibly allege a custom of retention of property past the point it is reasonably necessary. That "most" charges were dropped and "many" phones were not timely returned does not present the "concentrated, fully packed, precisely delineated scenarios" required to allege municipal liability. *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988) (internal quotation marks omitted). There is no indication how "many" phones were actually at issue. Plaintiffs also do not allege when the phones' return was requested, when the charges were ("mostly") dropped, and when investigations were concluded. A host of other factors would be at play as well, including the time it would take to process all the evidence from such a large-scale incident, as well as the extent to which the USAO was willing to authorize the release of the evidence collected. *See* JA 84 (providing that the prosecutor shall sign a form authorizing the release of property when cases are no

papered).  Especially without any of these details, this incident does not support a pervasive custom.

*Fifth*, the handful of other instances plaintiffs reference, including the other individuals arrested along with the *Cameron* protestors, do not establish a custom. JA 26-28, 55-58.  MPD made more than 19,000 arrests in 2020.  MPD, *Annual Report 2020* at 28, https://tinyurl.com/2s3rt2ch.  The existence of a comparative handful of cases cannot plausibly allege that a District policymaker "knowingly ignore[d] a practice that was consistent enough to constitute a custom." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).  Even in combination with their other allegations, plaintiffs fail to state a claim of municipal liability.

There are other flaws in plaintiffs' allegations of a municipal custom as well. For instance, plaintiffs acknowledge that District policymakers have established policies regarding retention of lawfully seized personal property.  JA 29-30, 54, 58; Br. 6-7; *see also* JA 28 (citing the Office of Police Complaints report), 58 (same). Plaintiffs do not challenge the substantive requirements those policies impose for MPD's retention of property, even if (as alleged) they have been imperfectly implemented.  *See* JA 28-30, 58.  Indeed, District policymakers have also established the Office of Police Complaints to hear and resolve individual complaints, including the alleged mishandling of arrestees' property.  D.C. Code § 5-1104; 6A DCMR

§ 2103; JA 119. This is directly contrary to plaintiffs' claim that District policymakers knowingly tolerated the "custom" alleged in this case.

Moreover, plaintiffs do not adequately allege that, as a general matter, the purported custom involved intentional, as opposed to merely negligent or mistaken, retention of property by District employees. *See* Br. 52. Assuming that the mere continued possession of lawfully seized personal property could constitute a constitutional violation, such violation would still require intentional conduct. *See Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) ("In sum, the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful conduct." (citation omitted)). After all, on plaintiffs' theory, the retention of property is a Fourth Amendment "seizure," and "[v]iolation of the Fourth Amendment requires an *intentional* acquisition of physical control." *Id.* (emphasis added). The intentionality requirement "is implicit in the word 'seizure,' which can hardly be applied to an unknowing act." *Id.*[10]

---

[10]     Assuming retention of lawfully seized property implicates the Fourth Amendment, the District does not dispute that plaintiffs have adequately alleged for present purposes that their *own* property was intentionally retained for at least some period of time. *See* JA 20, 53, 137 (alleged communications from MPD suggesting that the District considered the cell phones to be evidence). But that is insufficient for municipal liability, which requires plaintiffs to plead that a District custom caused the constitutional violation. *Hurd*, 997 F.3d at 337. Because plaintiffs do not plausibly allege that the District's *custom* was to *intentionally* retain property— whether to search it or for any other purpose—it cannot be the "moving force" behind the alleged violation here. *Id.*; *see* JA 137-39.

The district court made the point in a different context, but it still stands: it is "equally plausible (if not more so) that MPD's failure to timely give owners back their seized phones is the result of simple negligence." JA 139. Contrary to plaintiffs' suggestion, Br. 52, the fact that people requested return of their property does not make the District's alleged failure to comply any more plausibly intentional. Whether that failure is the result of miscommunication with the USAO, paperwork delays, or misplaced property, such negligence or inadvertence is not a proper basis on which to impose constitutional liability. The Fourth Amendment does not constitutionalize every tortious claim involving property interests. Indeed, "[i]f the [allegations] presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability." *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986).[11]

---

[11]     Plaintiffs rely on *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020), to argue the opposite. Br. 52. But that case involved "an isolated act of negligence" by an officer who delayed getting a search warrant. *Id.* at 212. That the *search*—obviously an intentional act—was deemed unreasonable because of a delay caused by negligence does not support imposing liability for the retention of property here. *Id.* at 211. The rule that an arrestee must receive a probable cause determination within 48 hours absent a bona fide emergency or other extraordinary circumstances similarly does not suggest that the negligent retention of personal property can amount to a Fourth Amendment violation. Br. 52-53 (citing *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)).

III.   **The District Court Properly Declined To Exercise Supplemental Jurisdiction.**

Because the district court properly dismissed the federal claims, it did not abuse its discretion in declining to exercise supplemental jurisdiction over the local law claims.  *English*, 717 F.3d at 975.

## CONCLUSION

The Court should affirm the district court's dismissal of the complaints in these cases.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

/s/ Marcella Coburn
MARCELLA COBURN
Assistant Attorney General
Bar Number 1616416
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5693
April 2023                                     marcella.coburn@dc.gov

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,410 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Marcella Coburn
MARCELLA COBURN